Michael T. McCLOSKEY, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Dec. 7, 1982.
Decided: Feb. 10, 1983.

Peter N. Letang (argued), Asst. Public Defender, Wilmington, for defendant below, appellant.

Alex J. Smalls (argued), Deputy Atty. Gen., Wilmington, for plaintiff below, appellee.

Before HERRMANN, C.J., QUILLEN and MOORE, JJ.

HERRMANN, Chief Justice:

In this appeal, the defendant seeks reversal of his convictions of Murder in the First Degree (11 *Del.C.* § 636),[1] Burglary in the Third Degree (11 *Del.C.* § 824),[2] and two counts of Possession of a Deadly Weapon During the Commission of a Felony (11 *Del.C.* § 1447).[3] The defendant contends that the Trial Court committed reversible error (1) in permitting the State to cross-examine expert witnesses regarding the de-

---

1. 11 *Del.C.* § 636 provides in pertinent part:
   "§ 636. Murder in the first degree; class A felony.
   "(a) A person is guilty of murder in the first degree when:
   (1) He intentionally causes the death of another person; ...."

2. 11 *Del.C.* § 824 provides in relevant part:
   "§ 824. Burglary in the third degree; class D felony.

"A person is guilty of burglary in the third degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein...."

3. 11 *Del.C.* § 1447 provides in pertinent part:
   "§ 1447. Possession of a deadly weapon during commission of a felony; class B felony.
   "(a) A person who is in possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during commission of a felony...."

fendant's statement to police that he had been involved in other criminal activity; and (2) in denying a defense motion for a mistrial based upon a dispute that arose between jurors during deliberation.

### I.

The defendant, Michael T. McCloskey, was indicted on the above charges in connection with the burglary of an American Legion Post (hereinafter "Club") and the killing of an employee of the Club during the burglary.

At trial before a jury, the State presented testimony to establish the following: The Club building comprised a meeting room, game room, bar area and kitchen. In the early pre-dawn hours of the day in question, the victim, Henry Gerard, arrived at the Club to begin his custodial-janitorial work. Upon his arrival, he found the defendant in the process of breaking into a game-room locker containing the bar receipts of the previous evening. The defendant ran into the unlighted kitchen to hide. When the victim entered the kitchen, a struggle ensued. The defendant took a knife from his pocket and slashed and stabbed the victim. The cause of the victim's death was established as severance of major blood vessels in the neck and severance of the windpipe.

The defendant admitted his involvement in the crime but contended that he did not kill the victim intentionally, as required by § 636. He testified that he went to the clubhouse to steal money—"to hurt the club"—in retaliation for the Club officers' limitation of his membership privileges.[4] According to the defendant, he hid in the kitchen to avoid a confrontation with the victim. He testified that it was only when the victim grabbed him that he retaliated with his pocket knife, but he could not remember how the knife got into his hands.

During the presentation of the defendant's case, he attempted to call as witnesses two psychiatrists to testify that he did not intend to kill the victim. The State indicated that if the doctors testified, it would introduce a statement made by the defendant to police concerning past criminal acts. The defendant had told the police, upon arrest for the instant crime, that he had committed three robberies in Maryland and a murder the previous year in Wilmington.

At a hearing to determine whether the State would be allowed to cross-examine the psychiatrists as to these statements, the psychiatrists stated that their opinions were based primarily upon the information they received from the defendant, namely, that he had not committed any "burglaries or serious physical crimes" or any other "violent crimes." They further testified that their opinions as to the defendant's intent would indeed be affected by the additional information. The Court ruled that the psychiatrists could be so cross-examined if called. The defendant did not call them to testify.

Late in the evening of the first day of jury deliberations, the Jury Forelady requested an *in camera* conference with the Trial Judge. The Court, with counsel, met with the Forelady. She informed the Court that Juror No. 4 was noncommunicative, refused to join in deliberations, and felt that the other jurors were antagonistic toward her. According to the Forelady, Juror No. 4 persisted in relying on her personal opinion or feelings despite exhortations by the other jurors to examine the evidence. Finally, the Forelady informed the Court that Juror No. 4 desired an interview with the Court.

The Trial Judge, with counsel, the Prothonotary and a court reporter, met the next morning with Juror No. 4. Although surprised that so many persons were present, Juror No. 4 stated that she was having difficulty understanding the instructions given by the Court and, because of

---

4. The defendant, a social member and part-time bartender at the club was active in club projects and committees. He became discontented, however, when club officers refused to extend full membership privileges to him, notwithstanding his extensive involvement.

this lack of understanding, other jurors were upset with her. She told the Court that she wanted to do what was right and could not be forced into reaching a result. The Court advised the juror that she should formulate any legal questions she may have, submit these to the Forelady, and the Trial Judge would address these questions in open court before the entire jury. The Trial Judge further stated that he would announce to the jury that the meeting in open court was the result of discussing the matter with one juror individually.

Outside of Juror No. 4's presence, defense counsel expressed his concern that calling the jury into open court would exert undue pressure on No. 4. More specifically, he was concerned that the cumulative effect of the previous evening's conference with the Forelady, the just-concluded conference with the juror, and the open court meeting with the jury would intimidate Juror No. 4, coercing her to join the decision of the other jurors despite her lack of understanding.

Shortly thereafter, the Court called in the jury to request any further questions. At the request of defense counsel, the Trial Judge did not mention that the request was prompted by an interview with an individual juror. No further questions were presented and the jury returned to the jury room.

Subsequently that morning, the Trial Judge informed counsel that he had received another note from the Forelady requesting a second interview. The Court proposed that it would direct the bailiff, in the presence of the jury, to ask the Forelady whether she still wished to speak with the Court. Defense counsel again voiced his concern that further contact between the Court and the Forelady could intimidate members of the jury, and especially Juror No. 4. The Trial Judge, concerned that the Forelady may have wished to communicate a matter unrelated to Juror No. 4, decided to speak with the Forelady if she so desired.

On the following day, the Court and counsel met for a second time with the Forelady. She stated that following the Court's request for questions, Juror No. 4 was noncommunicative and refused to consider the evidence. Indeed, she said, a heated discussion ensued during which Juror No. 4 told the other jurors to disqualify her and get an alternate. According to the Forelady, the jurors told Juror No. 4 that they did not want to disqualify her, that they did not want an alternate. The Forelady further recounted that she had encouraged Juror No. 4 to speak with the Trial Judge earlier.

Defense counsel moved for a mistrial on the ground that the apparent animosity among jurors, coupled with the Trial Judge's involvement with individual jurors, could result in juror intimidation and denial of a fair trial. The Court denied the motion but expressed concern about the *in camera* and in-court interviews and the possible detrimental effect of these interviews.

The Trial Judge subsequently met with the jury to respond to four additional questions jurors had raised.

The jury ultimately found the defendant guilty as charged. At the penalty hearing, the defendant was sentenced to life imprisonment without probation or parole for the conviction of Murder in the First Degree and five years imprisonment for each of the other offenses.

We reverse and remand for a new trial.

## II.

The defendant contends that the Trial Court committed prejudicial error in permitting the State, during *voir dire*, to cross-examine defense psychiatrists on a statement by the defendant regarding certain prior crimes, thereby vitiating the effectiveness of the doctors' testimony and preventing the defendant from calling them as witnesses. The defendant points to the general rule that evidence of other crimes is inadmissible to prove that the defendant committed the crime in issue. D.R.E.

404(b).[5] The statement in dispute, he argues, does not fall within any of the enumerated exceptions to the Rule, i.e., to show "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *Id.*

Moreover, according to the defendant, even if the statement may have been admissible under D.R.E. 404(b), the Court erred in allowing its presentation to the psychiatrists because any probative value was clearly outweighed by the prejudicial effect. D.R.E. 403.[6] We find these contentions to be without merit.

█ The defendant apparently confuses the Rules governing the general admission of character evidence consisting of prior crimes with the Rules relating to the formulation of opinion testimony by expert witnesses.

The record reveals that the Trial Judge ruled that the defendant's statement as to prior crimes was inadmissible in the State's case-in-chief because it would be unduly prejudicial. Such careful exercise of discretion by the Trial Judge is essential to the process. *See* D.R.E. 403. As this Court said in *Renzi v. State,* Del.Supr., 320 A.2d 711 (1974):

> "Because of its highly prejudicial nature, the admissibility of evidence of a crime is carefully circumscribed by the

requirements that there be substantial evidence that the defendant committed such prior crime [citations omitted] ... and that such evidence be 'plain, clear and conclusive [citation omitted].' "

320 A.2d at 712.

At issue, however, is not whether the statement should have been presented as general character evidence. Rather, the question here is (1) whether the statement was properly presented on *voir dire* to the psychiatrists as expert witnesses in testing the bases of their opinions; and (2) whether the statement ultimately could properly be presented to challenge the psychiatrists if they were called as experts before the jury.

█ Under D.R.E. 703,[7] even inadmissible facts or data may be introduced to test the basis of an expert's opinion, "if [the facts or data] are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Applying Rule 703, it is clear from the doctors' responses that their opinions would be affected by the statement and that the statement was "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *See Bates v. State,* Del.Supr., 386 A.2d 1139, 1144 (1978). Accordingly, although not generally admis-

5. D.R.E. 404(b) provides:
"Rule 404. Character evidence not admissible to prove conduct; exceptions; other crimes.
"(b) Other crimes, wrongs or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

6. D.R.E. 403 provides:
"Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion or waste of time.
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay,

waste of time or needless presentation of cumulative evidence."
In support of this contention, the defendant notes that (1) the record did not establish the actual commission of the crimes by the defendant; (2) the defendant was not able to properly define the crimes; and (3) the doctors testified that their conclusions would ultimately turn on the specific nature of the crimes.

7. D.R.E. 703 provides:
"Rule 703. Bases of opinion testimony by experts.
"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

sible in evidence, the statement was properly presented to the experts during *voir dire* and could properly have been presented to impeach them upon cross-examination. The Trial Judge did not abuse his discretion.

### III.

However, we find reversible error in the Trial Judge's denial of the defendant's motion for mistrial.

■ The defendant argues that the animosity that developed between Juror No. 4 and the other jurors, and the communications between an officious and overbearing Jury Forelady and the Trial Judge in connection therewith, tainted the impartiality of the jurors' deliberations and deprived the defendant of a fair trial, in that a reasonable probability of the intimidation of Juror No. 4 was created. The defendant concedes that a motion for a mistrial based upon an impropriety at trial is directed to the sound discretion of the Trial Court. *Smith v. State,* Del.Supr., 317 A.2d 20, 24 (1974). He asserts, however, that an examination of the record shows that the Trial Judge abused his discretion herein.

■ The State relies upon *Jacobs v. State,* Del.Supr., 418 A.2d 988 (1980), for the proposition that the defendant must demonstrate actual prejudice in order to prevail. The defendant has not shown actual prejudice, the State concludes, because there is nothing in the record to indicate that either Juror No. 4 or other members of the jury were actually influenced by the animosity among the jurors, the conduct of the Forelady, or the contacts with the Court.

The State's reliance upon *Jacobs, supra,* is misplaced. There, this Court stated:

"[W]hile no prejudice would have to be proven, in cases not involving formal stages of the proceedings actual prejudice should be conceivable before the presumption of prejudice prevails."

418 A.2d at 989. Thus, contrary to the State's contention, the defendant is not obligated to demonstrate actual prejudice.

The defendant has met his burden by showing that prejudice is manifestly "conceivable", if not apparent, on the record before us.

The series of *in camera* and in-court interviews has been outlined. Noteworthy are several excerpts from the record, all of which support the reasonable probability of the intimidation of Juror No. 4:

As to the developing antagonism between Juror No. 4 and the rest of the jurors, the Forelady stated the following during her first colloquy with the Court:

"We have a problem on the jury. Let me see how I can express it. We have one jury member—for some reason or other she feels as though we are antagonistic to her. We ask her, 'Well, what—what is your opinion?' And then tonight she said, 'I'm not going to tell you.' And she says, 'I'm tired.'

'Let me see what else. She quite often does not sit with the jury. She sits off to the side. In other words, she is not around the table.

\*   \*   \*

"The jury feels this particular juror is not communicative. In other words, she doesn't join in the deliberations. That's all I can say. Actually, I think she would like to come in to see you, too. That, I think, is the extent of what I can say, and it's a matter—I think we have tried to ask of this particular juror that, in order to form a jury—I mean when you consent to become a member of the jury, there has got to be communication. There has got to be deliberation from the evidence, from both sides of the evidence. And rather than being specific on the evidence, she seems to be basing—she keeps saying, 'I feel,' or the juror—all right. Strike that. The particular juror seems to say, 'I feel. I feel.' And we have been trying to get this particular juror to look at the evidence and to communicate . . .

\*   \*   \*

"[I] realize that one has to be very careful of accusations in a jury, and I am not really accusing—the jury as a whole is not accusing this particular juror. It is just that she—the juror feels as though nobody wants to listen to her, and then when we ask this particular juror, there is no communication. She just says—now, she may have a different version or—the juror may have a different version. I don't know."

We note that, in addition to revealing the developing animosity within the jury room, the above-quoted statement indicates the officious and overbearing attitude of the Forelady as "liaison" between the Trial Judge and the jury.

The growing animosity is confirmed by the following statements of Juror No. 4. during her interview with the Court:

"[I] think the other jurors are a little upset with me—okay?—because I'm having problems with a few words, or the wording of some statements, and I think because of this, they are having—they are maybe getting a little uptight with me.

Now, I can't say—I can't just do something because somebody wants me to do it. I have to feel like it's the right thing to do as far as I am concerned. Now, if that goes along with everybody else, fine, but if it doesn't—I'm not going to use the word intimidated. Anyway, I don't feel as though I can be forced into something I don't feel right about."

The Trial Judge subsequently expressed his concern that the Forelady was not acting as an impartial spokesperson for the jury:

"Both last night and today, when the Court took general questions to her as spokesman for the jury, her answers were a little bit more explicit about the differences of opinion on the jury and what her own opinion was than what I would have hoped for. I would, of course, have much preferred if she had spoken more impartially as a spokesman or not indicated her own preferences in connection with being a spokesman for the jury. In any additional questions I ask, I will try to keep that problem in mind."

Finally, the Forelady, during her second interview with the Court, and in an agitated manner, stated the following:

"And anyway, she said—and I stood up and—she said 'I don't have to say anything to you.' And I stood up, as foreman of the jury, and I have been normally sitting down. I stood up, and I said, 'part of the jury's duty is to deliberate, and in order to deliberate, you have absolutely got to communicate.' And then this particular juror said, 'Disqualify me. Disqualify me. Get an alternate.'

We all said, 'we don't want our alternate. We do not want to disqualify you.' And I guess we ended on that note.

\* \* \*

"I have one more thing that I would like to say. When—before I came in to see you last night, this particular juror said, 'You can tell the Judge anything you want.' And I said, 'I'm going to tell you now, not one thing more or one thing less.' And I told her that we felt it was a lack of communication between this particular juror and the rest—this particular juror and the rest of the jurors. And I said, 'I suggest you talk to the Judge.' And that was the last thing I said to her.

But there were only two things that were said, and I felt that what she said to me about 'You can tell the Judge anything you want,'—I felt she was saying to me—and I know what she said: 'Nothing will change my mind.' . . . ."

■ In sum, the record establishes a reasonable probability of the unlawful intimidation of Juror No. 4 sufficient to raise a presumption of prejudice. We observe that the situation was one into which the Trial Judge was inadvertently drawn, despite his careful efforts to clarify the jurors' questions on the law.[8] Nevertheless, we must

8. It seems to us that such confrontations between the Court and jurors can usually be

hold that the Trial Judge abused his discretion in denying the motion for a mistrial.

\* \* \*

Reversed and remanded for a new trial.

avoided by the use of notes, which can be made part of the record, and by general instructions in open court. Private interviews, while perhaps necessary in some instances, increase the likelihood of prejudice based upon perceived privileged or special access.