Christopher DESMOND, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 42, 1993.

Supreme Court of Delaware.

Submitted: Oct. 4, 1994.
Decided: Nov. 14, 1994.

Anthony A. Figliola, Jr., Figliola & Facciolo, Wilmington, for appellant.

Steven P. Wood, Dept. of Justice, Wilmington, for appellee.

Before VEASEY, C.J., and WALSH, HOLLAND, HARTNETT, and BERGER, JJ. (constituting the Court *en Banc*).

HOLLAND, Justice:

After a jury trial, the defendant-appellant, Christopher Desmond ("Desmond"), was convicted of the following offenses: ten counts of Robbery in the First Degree (11 *Del.C.* § 832); ten counts of Possession of a Deadly Weapon During the Commission of a Felony (11 *Del.C.* § 1447); two counts of Conspiracy in the Second Degree (11 *Del.C.* § 512); three counts of Possession of a Deadly Weapon by a Person Prohibited (11 *Del.C.* § 1448); three counts of Theft (11 *Del.C.* § 841); and one count of Escape in the Third Degree (11 *Del.C.* § 1251). This is Desmond's direct appeal.

Desmond alleges that five errors were committed at trial. First, according to Desmond, the Superior Court erred in failing to suppress certain evidence the police seized pursuant to an allegedly invalid search warrant. Second, Desmond asserts that the Superior Court erred in permitting the State to question him about his prior convictions without first making an independent finding that the probative value of the convictions outweighed their prejudicial effect. *See* D.R.E. 609. Third, Desmond contends that improper contact between the trial judge and a juror, when followed by an *Allen* charge to all jurors, denied him his right to a fair trial. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Fourth, Desmond contends that the constitutional prohibition against Double Jeopardy prohibits dual convictions, and consecutive sentences, on charges of Possession of a Deadly Weapon During the Commission of a Felony and of Robbery in the First Degree, when based on similar standards of proof. Finally, Desmond submits that the Superior Court erred in failing to grant his *pro se* motion for a mistrial due to ineffective assistance of counsel.

*Facts*

Between December 15, 1990 and October 8, 1991, five robberies took place at various supermarkets and pharmacies in different parts of New Castle County. Witnesses testified that, in each of the robberies, a man, armed with a gun, entered the stores and demanded money. Desmond was eventually arrested as the perpetrator of the robberies.

On the night of December 15, 1990, Marilyn McBride and Karen Weischedel were working at the Super Fresh Supermarket in Claymont, Delaware. Three men entered the store. One man displayed what appeared to be a "dark gray or black" handgun, while a second removed cash from the store's safe. After the two men fled, Ms. McBride reached under a counter to press the store's panic button. The third man noticed Ms. McBride's movement and said, "Hey, what are you doing?" He then also fled.

Ms. McBride was subsequently shown a photographic lineup. She identified Desmond as the third man involved in the robbery. Both Ms. McBride and Ms. Weischedel also made in-court identifications of Des-

mond as the third accomplice.[1]

On July 18, 1991, a man entered Happy Harry's pharmacy and, from a distance of two to three feet, pointed a gun at the head of Herbert Neal, an employee. Mr. Neal testified that the gun was "grayish silver" and "appeared to be a nine millimeter" pistol. The gunman ordered Mr. Neal to empty the contents of the store's safe into a box. The gunman then retrieved the box and fled. Several months later, Mr. Neal identified Desmond as the gunman from a photograph. At trial, Mr. Neal stated he was positive that Desmond was the robber.[2]

On September 7, 1991, Dawn Theetge was working at the Acme Supermarket at F & N Plaza in Wilmington. At about 7:00 p.m., a man approached the customer service office and pointed a gun at Ms. Theetge. She described it as a "small, silver gun" with a "pearlish, opal-type handle." The robber demanded that she open the cash register and give him the money it contained. While the robbery was in progress, a second employee, Thomas Applegarth, entered the office. The robber pointed the gun towards Mr. Applegarth and ordered him to assist Ms. Theetge. After the employees handed over the money, the robber fled.

Ms. Theetge subsequently identified Desmond as the robber in a photographic line-up and in court. Another witness, Jeffrey Eck, tentatively identified Desmond both in a line-up and in court. Mr. Applegarth did not testify.[3]

Linda Mikolaitis was working at the Tri-State Mall Thriftway courtesy booth on September 7, 1991. At about 8:00 p.m., one hour after the robbery at the supermarket at F & N Plaza, a man inserted a gun through the booth's window and said "this is a hold-up—give me your big bills." Ms. Mikolaitis had never before seen a gun. She assumed the man was holding a toy gun and making a joke. She changed her mind, however, due to the man's demeanor and because, on clos-

er inspection, the gun "didn't look plastic, it looked metal and it had to be real." Ms. Mikolaitis then delivered a large amount of cash from the store safe to the robber.

Two other Thriftway employees witnessed the robbery. Michelle Ulmer entered the booth while Ms. Mikolaitis was emptying the safe. The robber told her to be quiet and pointed what she believed to be a "small silver gun" at her. She observed the gun from close range. The two women, Ms. Mikolaitis and Ms. Ulmer, later identified Desmond as the gunman both in photographic line-ups and in court.[4]

On October 8, 1991, a man attempted to enter the cashier's booth at the Shoprite Supermarket. When he was confronted by two employees, Sheila Harvey and Alka Modi, he pulled out a gun and directed them to lie down. Ms. Harvey described the gun as "silver" with "a pearl handle."

Patricia Lewicki observed the man with her co-workers from her office approximately five feet away. When she attempted to intervene, the robber turned the gun towards her. She saw the gun and described it as a "silver . . . square type" handgun. Elizabeth Alessia, another Shoprite employee, also witnessed the events from close range. She described the robber's weapon as a "silver gun" but didn't know whether it was "real or fake."

The robber proceeded from the cashier's booth to the courtesy booth and demanded money from employees Donna Ireland and Elizabeth Beatty. The robber handed Ms. Ireland a yellow plastic bag imprinted with the Shoprite logo and told her to fill it with money. Ms. Ireland placed in the bag $1601.00 in one dollar bills wrapped in purple and white D.A.R.T. money wrappers. The robber then attempted to flee.

Dale Moore, alerted by a shout of "robbery," saw a man sneaking out the door and

---

1. The jury was unable to reach a verdict and the Superior Court declared a mistrial as to the counts charged in connection with this robbery.

2. The jury was unable to reach a verdict and the Superior Court declared a mistrial as to the counts charged in connection with this robbery.

3. The jury convicted Desmond on all counts charged in connection with this robbery.

4. The jury convicted Desmond on all counts charged in connection with this robbery.

went in pursuit. Armed with a broom handle, Mr. Moore caught up to within ten feet of the robber. The robber then stopped, turned, and reached for his weapon. Mr. Moore backed away and the robber escaped.

By the time of the Shoprite robbery, Desmond had become a primary suspect in the police investigation. The police arrived at the Shoprite store shortly after the robbery and displayed a photographic line-up to the employees. Several employees, with varying degrees of certainty, identified a photo of Desmond as the robber.

The police obtained a search warrant and searched Desmond's house. In Desmond's dining room, the police found a yellow Shoprite bag. The police also recovered $1,599.00 in one dollar bills and numerous purple and white D.A.R.T. money wrappers. Desmond was discovered hiding under some laundry in his basement and was arrested.[5]

Desmond was taken to the police station after his arrest. While being processed, Desmond jumped from a second story window and attempted to escape. The police recaptured Desmond after a brief chase.[6]

*Jury Deliberations*

The jury began to deliberate on Wednesday, November 4, 1992. At 10:00 a.m. the following day, the bailiff informed the trial judge that there was "trouble with a juror." The judge, unaware of the nature of the problem, met *ex parte*, privately and off-the-record with Juror No. 7.

The juror told the trial judge she had doubts about Desmond's guilt and that, as of 5:00 p.m. the previous day, she was the only juror who harbored such doubts. The judge promptly recognized the impropriety of the discussion and terminated the conversation. He asked the juror to return to the jury room to resume deliberation.

Later that day, at 1:45 p.m., the bailiff informed the trial judge that Juror No. 7 was upset and desired to speak with him again. The judge instructed the bailiff to tell the juror that he would not meet with her but

that she could communicate with him by note. Juror No. 7 wrote a note and gave it to the bailiff. The judge decided, however, on further reflection, that he would not accept the individual juror's note but would only accept a note from the jury as a whole. The note from Juror No. 7 remained unread. Juror No. 7 was apparently asked by the bailiff to continue deliberating.

At about 3:00 p.m., the foreman sent the judge a note on behalf of the entire jury panel. The bailiff advised the judge that Juror No. 7 refused to return to the jury room. The trial judge then met with the juror again, alone and off the record. He asked her to return to the jury room. The judge also told her that he would direct the jury to suspend deliberations until further notice.

At 3:30 p.m., the judge conferred with counsel. There, for the first time, he informed them of the situation and the substance of his two prior private conversations with Juror No. 7. He indicated his intent to read an *Allen* charge to the jury. Defense counsel objected, fearing that Juror No. 7 remained the lone hold-out against convicting, and that the *Allen* charge would coerce her into changing her position. The judge overruled defense counsel's objection.

The jury was then called back into court. The judge read aloud the jury foreman's note. It stated that the jury had reached a verdict on one count but was unable to reach a verdict on the other thirty-seven counts. The judge then read the *Allen* charge and asked the jury to continue to deliberate. Shortly thereafter, at 5:00 p.m., the jury asked for permission to recess until Monday, November 9. The judge granted the request.

The jury reconvened at 10:00 a.m. on Monday. Deliberations continued until early afternoon at which time the jury foreman announced the jury had reached a verdict on twenty-nine counts but was still unable to reach a verdict on the remaining nine. The judge accepted the partial verdict and de-

---

5. The jury convicted Desmond on all counts charged in connection with the Shoprite robbery.

6. The jury convicted Desmond on one count of attempted escape.

clared a mistrial as to the remaining nine counts.

### Search Warrant Valid
### Evidence Properly Admitted

Desmond's first argument is that the Superior Court erred in failing to suppress evidence the police seized with an allegedly invalid search warrant. Desmond offers two contentions to support this argument. First, he argues the Superior Court should have concluded the search warrant was invalid because Gloria Desmond, his wife, testified that the police left an unsigned, and therefore invalid, copy of the search warrant on the kitchen table after conducting their search. Second, he argues that no evidence was presented to establish the validity of the search warrant because the State did not introduce an Affidavit of Probable Cause at trial. We find both contentions without merit.

■ First, the Delaware statutes governing searches and seizures require that a return on the original search warrant be made to a judicial officer after it has been executed. 11 *Del.C.* § 2307. The police had no duty, however, to leave a copy of the properly signed search warrant at Desmond's residence. *See* 11 *Del.C.* § 2301 *et seq.* The fact that the police left an unsigned copy of the search warrant at Desmond's home does not invalidate the search, nor does it establish that the search warrant, as originally issued, was unsigned.

■ Second, the State was not required to introduce the Affidavit of Probable Cause for the search warrant during the trial proceedings in the Superior Court. The State had earlier introduced the original warrant, properly executed by a Justice of the Peace, along with the signed Affidavit of Probable Cause, at a pre-trial suppression hearing. Following the pre-trial hearing, the Superior Court determined the search warrant was valid.

That ruling became the law of the case. There is no requirement that the State reintroduce the affidavit at trial. The Superior Court's decisions—that the warrant was valid and that evidence seized pursuant to the warrant was admissible—are affirmed.

### D.R.E. 609
### Prior Convictions Admissible

Desmond's second argument is that the Superior Court erred in permitting the State to question him about his prior convictions without first making an independent finding either that the probative value of the convictions outweighed their prejudicial effect or that the crimes involved "dishonesty or false statement." According to Desmond, the trial judge was required to, but did not, make such a finding pursuant to Delaware Rule of Evidence 609.[7] The record reflects that Desmond's argument is without merit.

■ Before Desmond testified on his own behalf, the prosecutor showed Desmond's defense counsel certified docket sheets listing five prior convictions that the State deemed admissible pursuant to D.R.E. 609(a). Nevertheless, during his direct examination, Desmond stated he had been convicted of "two or three" felonies. On cross-examination, Desmond initially repeated his assertion that he was convicted a total of "three times" for felonies and crimes involving dishonesty or false statement.

The prosecutor then started to ask Desmond about a specific prior felony conviction. Desmond's attorney objected. The trial judge held a side-bar conference on the record. After considering Desmond's objection, the trial judge ruled that, pursuant to D.R.E. 609(a), the State would be permitted to cross-examine Desmond with respect to four felony convictions and one misdemeanor conviction for theft, since the latter conviction involved dishonesty.

---

7. Delaware Rule of Evidence 609 provides:
    (a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted but only if the crime (1) constituted a felony under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect or (2) involved dishonesty or false statement, regardless of the punishment.

The prosecutor proceeded to identify those prior convictions for Desmond and asked him whether he remembered the date and nature of each.[8] Desmond responded affirmatively and eventually admitted the true number of his conviction for felonies and crimes involving dishonesty. The trial judge immediately instructed the jury, with the concurrence of all counsel, to consider Desmond's prior convictions for the limited purpose of impeaching his credibility and not in assessing his guilt or innocence. *See* D.R.E. 105; *Weber v. State,* Del.Supr., 547 A.2d 948 (1988).

The record reflects that the Superior Court did not abuse its discretion. The State was properly permitted to confront Desmond with evidence that contradicted his direct testimony concerning his prior convictions for felonies or crimes of dishonesty. That evidence was admissible for the proper limited purpose of impeaching Desmond's credibility generally, as well as specifically in view of Desmond's inaccurate testimony during his direct examination. D.R.E. 607 and 609(a).

### Allen Charge
### Following Judge/Juror Contact

Desmond argues that the *Allen* charge to the jury, following the trial judge's *ex parte* communications with Juror No. 7, was coercive and constituted reversible error. The State acknowledges that the *ex parte* communications constituted error. According to the State, however, the error was harmless and did not make the subsequent *Allen* charge coercive.

■ This Court has traditionally examined allegations that an *Allen* charge was coercive by focusing upon four factors. *Streitfeld v. State,* Del.Supr., 369 A.2d 674 (1977). *Streitfeld* directs this Court to consider (1) the timing of the instruction, (2) the words used in the instruction, (3) the length of the deliberations both before and after the instruction, and (4) the complexity of the case. *Id.* at 677. *See also Boatson,* Del.Supr., 457

A.2d 738, 743 (1983). Accordingly, we will consider the facts relevant to this claim of error.

■ The first critical fact, with respect to the timing of the *Allen* charge in this case, is that it followed the trial judge's unrecorded private *ex parte* communications with Juror No. 7. The leading Delaware case on the subject of communications with a juror during the course of deliberations is *McCloskey v. State,* Del.Supr., 457 A.2d 332 (1983). In *McCloskey,* both a forewoman and another juror communicated separately with the trial judge and counsel *in camera.* Even though that communication was not *ex parte,* but in the presence of counsel and on the record, this Court concluded the defendant had shown a reasonable probability of unlawful intimidation of a juror and, therefore, reversible error.

This Court has held that one of the essential features of the right to trial by jury is the inviolability of its deliberative process. *Claudio v. State,* Del.Supr., 585 A.2d 1278, 1301 (1991). In *McCloskey,* this Court explained that most juror questions should be addressed through written notes. *McCloskey v. State,* 457 A.2d at 338 n. 8. Private interviews "increase the likelihood of prejudice based upon perceived privileged or special access." *Id.* The meetings between the judge and Juror No. 7 in this case are disconcerting given this Court's prospective guidance in *McCloskey.*

The potentially prejudicial circumstances of the private meetings in the case *sub judice* are exacerbated because the meetings were *ex parte,* without the consent of counsel, and unrecorded. The United States Supreme Court has summarized the problems inherent in unrecorded private *ex parte* communications between a trial judge and juror:

> First, it is difficult to contain, much less to anticipate, the direction the conversation will take at such a meeting.... Second, any occasion which leads to communication with the whole jury panel through one

---

8. For example:
   PROSECUTOR: Do you remember being convicted of arson first degree on or about July 31st, 1985?

DESMOND: Yes.

juror inevitably risks innocent misstatements of the law and misinterpretations despite the undisputed good faith of the participants.... Finally, the absence of counsel from the meeting and the unavailability of a transcript or full report of the meeting aggravate the problems of having one juror serve as a conduit for communicating instructions to the whole panel.

*United States v. United States Gypsum Co.,* 438 U.S. 422, 460–61, 98 S.Ct. 2864, 2885, 57 L.Ed.2d 854 (1978).

■ The second critical fact, with respect to the timing of the *Allen* charge in this case, is it occurred after Juror No. 7 privately reported to the trial judge that the jury was divided 11–1 and that she alone declined to find Desmond guilty. It is per se reversible error for a trial judge to inquire as to a jury's numerical division. *Brasfield v. United States,* 272 U.S. 448, 450, 47 S.Ct. 135, 135, 71 L.Ed. 345 (1926). *Brasfield* is not implicated, however, where a jury note indicates their numerical division without prompting from the court. *United States v. Parsons,* 993 F.2d 38, 41–42 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 266, 126 L.Ed.2d 218 (1993).[9] Nevertheless, the trial judge's obligation to avoid coercion is heightened under such circumstances.

Accordingly, this Court must next carefully consider the actual language used in the *Allen* charge given to Desmond's jury. This Court has held the *Allen* charge, or "dynamite charge," is proper when the total effect of the charge is not overly coercive and the jurors are admonished not to surrender their honest convictions. *Brown v. State,* Del. Supr., 369 A.2d 682 (1976). *See also Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

In *United States v. Ajiboye,* 961 F.2d 892, 894 (9th Cir.1992), for example, the court held it reversible error for a trial judge, if inadvertently told of the jury's numerical division, to give an *Allen* charge in a way that a holdout juror could interpret as being addressed directly to him or her. Conversely, "[w]here the jury has disclosed the split voluntarily and the instruction has not focused on the minority, courts have generally upheld a supplemental charge." *United States v. Lash,* 937 F.2d 1077, 1086 (6th Cir.1991) *cert. denied,* 502 U.S. 1061, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992). In Desmond's case, the *Allen* instruction was complete and evenly balanced. In fact, it was a paragon of objective guidance for how a jury should resume its deliberations in a rational manner and with detached reflection for the views of others.

Finally, this Court must consider the events following the *Allen* charge. In this case, the jury deliberated for an hour and one-half before recessing for a three-day weekend. When the jury returned, it deliberated for several hours. Eventually, the jury was able to reach unanimous verdicts on twenty-nine counts and concluded it could not reach unanimous verdicts on the nine remaining counts.

An appellate court is required to consider all of the circumstances when determining whether the use of the *Allen* charge was coercive. *Lowenfield v. Phelps,* 484 U.S. 231, 237, 108 S.Ct. 546, 550, 98 L.Ed.2d 568 (1988); *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965). *Boatson v. State,* Del.Supr., 457 A.2d 738, 744 (1983); *Streitfeld v. State,* Del.Supr., 369 A.2d 674, 677 (1977). An *Allen*-type charge has not been found coercive, even though the judge was aware of the numerical division in the jury, when the charge in-

---

**9.** *See also United States v. Lash,* 937 F.2d 1077, 1085–86 (6th Cir.1991), *cert. denied,* 502 U.S. 1061, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992); *United States v. Gabriel,* 597 F.2d 95, 100 (7th Cir.), *cert. denied,* 444 U.S. 858, 100 S.Ct. 120, 62 L.Ed.2d 78 (1979) (even though jury had informed judge of 11 to 1 division, modified *Allen* charge found not coercive); *United States v. Robinson,* 560 F.2d 507, 517 (2d Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978) (same); *Sanders v. United States,* 415 F.2d 621, 629–31 (5th Cir.1969), *cert. denied,* 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970) (same). *Compare Stewart v. State,* 334 Md. 213, 638 A.2d 754, 758–61 (1994) (holding *ex parte* communication between judge and juror was reversible error by relying on Maryland Rule 4–326(c), which mandatorily proscribes *ex parte* communications between a judge and a juror, and Maryland Rule 4–231, which entitles the defendant to be present at every stage of trial).

structed both the minority and the majority to reconsider their positions without abandoning their oaths. *United States v. Lash,* 937 F.2d at 1086. The totality of the following circumstances in Desmond's case leads to the conclusion that the *Allen* charge was not coercive: the seemingly innocuous nature of the *ex parte* communications that Juror No. 7 initiated; the unprompted nature of Juror No. 7's disclosure of the numerical division among the jury; the trial judge's immediate discontinuance of the meeting upon such disclosure; the *Allen* charge's text, which paralleled the model instruction; the length of the jury's deliberations before and after the *Allen* charge was given; and the jury's return of a mixed verdict, after a three day suspension and several additional hours of deliberation. Under these circumstances, even though the trial judge's private, unrecorded, *ex parte* meeting with Juror No. 7 constituted error, such error did not make the subsequent *Allen* charge coercive and, therefore, was harmless beyond a reasonable doubt. *See, e.g., Rushen v. Spain,* 464 U.S. 114, 117 n. 2, 120, 104 S.Ct. 453, 455 n. 2, 456, 78 L.Ed.2d 267 (1983); *United States v. Lash,* 937 F.2d at 1085–86; *United States v. Frazin,* 780 F.2d 1461, 1470 (9th Cir.), *cert. denied,* 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986). *But see United States v. Sae–Chua,* 725 F.2d 530 (9th Cir.1984); *United States v. Seawell,* 550 F.2d 1159 (9th Cir.1977).

### Deadly Weapon Conviction Not Double Jeopardy

Desmond's fourth argument on appeal is that his convictions for Robbery in the First Degree and for Possession of a Deadly Weapon During the Commission of a Felony ("PDWDCF") violate the Constitutional prohibition against Double Jeopardy. Desmond alleges that each of the separate dual convictions for those crimes, giving rise to consecutive sentences, violates the Double Jeopardy Clause. According to Desmond, the Superi-

or Court improperly allowed the jury to convict him under the two distinct statutes based on the same standard of proof.[10]

■ It is now settled Delaware law that defendants can be convicted and punished under both statutes, Robbery in the First Degree and PDWDCF, based on the same set of facts because "the statutes work to prevent distinct evils." *LeCompte v. State,* Del.Supr., 516 A.2d 898, 902 (1986).

> The weapons law focuses on the actual risk attendant to the presence of a deadly instrumentality during the commission of a felony. *See Mack [v. State,* Del.Supr., 312 A.2d 319, 321–22 (1973) ]. The first degree robbery statute covers the interaction between the aggravated circumstances created by the defendant's conduct and the perceptions of the victim. *See [State v.] Smallwood,* [Del.Supr., 346 A.2d 164, 166–67 (1975) ]. Thus, even though the statutes overlap in the sense that a defendant may be convicted of both crimes on essentially the same facts, the different focus and emphasis of each statute demonstrate a legislative intent that these two separate offenses give rise to cumulative sentencing.

*LeCompte v. State,* 516 A.2d at 903.

In a related argument, Desmond contends that even if the evidence adduced at trial, consisting mainly of victims' testimony that he possessed what looked like a "real gun," sufficed to prove beyond a reasonable doubt that he "appeared" to have a deadly weapon, that same testimony was insufficient to prove that he, in fact, possessed a deadly weapon. Desmond essentially contends that the eyewitness testimony, being wholly circumstantial evidence, was insufficient "credible evidence" to prove, beyond a reasonable doubt, that he actually possessed a deadly weapon. *See Jenkins v. State,* Del.Supr., 401 A.2d 83 (1979). Therefore, he argues, this Court should overturn his PDWDCF conviction as a matter of law.

---

**10.** To convict a defendant of Robbery in the First Degree, the jury must find, beyond a reasonable doubt, that the accused committed the crime of Robbery in the Second Degree and during the commission of that crime "display[ed] what appear[ed] to be a deadly weapon." 11 *Del.C.* § 832(a)(2). To be convicted of PDWDCF, the jury must find, beyond a reasonable doubt, that the defendant committed a felony while in "possession of a deadly weapon." 11 *Del.C.* § 1447(a).

Desmond's argument requires a consideration of the minimum circumstantial evidence required to support a PDWDCF conviction. For the purpose of reviewing a claim of insufficient evidence there is no distinction between direct and circumstantial evidence. *Shipley v. State,* Del.Supr., 570 A.2d 1159, 1170 (1990). Accordingly, to sustain a conviction for PDWDCF, the State need not recover the weapon involved, nor must the weapon have been fired during the course of the felony. The "relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Williams v. State,* Del. Supr., 539 A.2d 164, 168, *cert. denied,* 488 U.S. 969, 109 S.Ct. 500, 102 L.Ed.2d 536 (1988) (*quoting Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in original).

Examining the evidence presented in the light most favorable to the State, we find the circumstantial eyewitness testimony sufficient to enable a rational trier of fact to find beyond a reasonable doubt that Desmond, in fact, possessed a deadly weapon. The record reflects that most of the witnesses viewed the weapon at close range and for extended periods of time. The substantial similarity of their detailed descriptions of the weapon enabled a rational trier of fact to conclude that what Desmond appeared to possess was, in fact, a deadly weapon.

### *Ineffective Assistance of Counsel Not Ripe for Decision*

Desmond's final argument involves his *pro se* motion for a mistrial due to ineffective assistance of counsel. The Superior Court declined to address the issue, suggesting that such a claim would be more appropriately raised in a post-conviction motion. This Court has consistently held it will not consider a claim of ineffective assistance of counsel on direct appeal if that issue has not been decided on the merits in the trial court. *Duross v. State,* Del.Supr., 494 A.2d 1265 (1985); *Collins v. State,* Del.Supr., 420 A.2d 170, 177 (1980); *Harris v. State,* Del.Supr., 293 A.2d 291, 293 (1972). Accordingly, Des-

mond's claim of ineffective assistance of counsel will not be considered in this direct appeal.

### *Conclusion*

The judgments of the Superior Court, which resulted in Desmond's convictions, are AFFIRMED.