Brian S. O'NEIL, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 5, 1996.

Supreme Court of Delaware.

Submitted: Feb. 19, 1997.
Decided: March 21, 1997.

Before VEASEY, C.J., WALSH, and HARTNETT, JJ.

Charles E. Whitehurst, Jr., Young, Malmberg, Whitehurst & Curley, Dover, for Appellant.

Kim E. Ayvazian, Deputy Attorney General, Department of Justice, Georgetown, for Appellee.

WALSH, Justice:

Defendant-appellant, Brian S. O'Neil (O'Neil), was convicted, following a jury trial, of Burglary First Degree (11 *Del.C.* § 826); Attempted Robbery First Degree (11 *Del.C.* § 531); and two counts of Possession of a Deadly Weapon During the Commission of a Felony (11 *Del.C.* § 1447). In this appeal, O'Neil contends the Superior Court erred by: (1) failing to grant his motion to suppress evidence; (2) allowing the State to amend the Information during the course of trial; and (3) failing to grant his motion for judgment of acquittal on the charge of burglary in the first degree. O'Neil also advances a claim that the State failed to meet its *Brady* obligation and made improper comments during jury summation which improperly shifted the burden of proof to the defense.

After a careful review of the record, we conclude that the Superior Court did not err in its rulings. We also conclude that the prosecutor's remarks during summation did not have the effect of improperly shifting the burden of proof to the defendant. Finally, we find that the State did fail to reveal exculpatory material to the defense in violation of its *Brady* obligation, but, such an omission in the context of the evidence supporting probable cause constitutes harmless error. Accordingly, we affirm.

## I

The events leading up to the arrest and conviction of O'Neil are as follows. On November 11, 1994, Detective James Fraley ("Fraley") of the Delaware State Police was called upon to investigate a reported robbery at Marvel's Liquor Store ("Marvel's") near Rising Sun. Upon arriving at the store Fraley interviewed the proprietor, Reven Rubens ("Rubens"). Rubens told police that at approximately 7:30 p.m. an individual appeared in the store brandishing a large caliber hand gun and demanded money. In response to the threat, Rubens turned over approximately $220 to the perpetrator who then left the store without incident. According to Rubens, the perpetrator was approximately 5'4" to 5'8" tall and heavyset in build. He was wearing a dark colored ski mask, a black hooded jacket or sweater, and dark colored jeans or sweat pants. Rubens was unable to identify the man's race but commented that he appeared to be dark.

While concluding this investigation, Detective Farley was informed that a second burglary had been committed at 77 Duchess Circle, Royal Grant, by a person who matched the description of the Marvel's perpetrator. Fraley proceeded to the second crime scene which was located approximately three miles from Marvel's. At that location Fraley interviewed Nicholas Theodorakos ("Nicholas"), the thirteen year old son of Peter and Catherine Theodorakos. Nicholas told police that he had been home alone watching television in the basement when, at approximately 7:30 p.m., he went to the first floor of the house and witnessed a man coming out of his father's bedroom. At first Nicholas thought the intruder was his friend Eric playing a joke. He quickly realized, however, that a crime had occurred when he noticed that the back door to the house had been kicked in. Upon being spotted, the intruder pointed a black automatic hand gun at the boy and then ran out of the house through the back door. Nicholas immediately called his mother who, after noticing her husband's diamond ring was missing from the bedroom, called 911 to report the burglary.

The intruder was described by Nicholas as a white male standing approximately 5'3" tall with a stocky build. The man wore gloves, a face mask with holes for the eyes and mouth, and sweat pants, all black in color. After hearing her son describe the encounter, Mrs. Theodorakos told police that she suspected the intruder was O'Neil. The police were told that O'Neil was familiar with the Theodorakos residence because in the past he, as well as several of his relatives, had worked for the family in various capacities. Mrs. Theodorakos further told police that she had been informed by O'Neil's stepfather that O'Neil had stolen checks from him and had written over two thousand dollars worth of bad checks.

Upon returning to police headquarters after the Theodorakos investigation, Fraley was informed by fellow officers that shortly after 9:00 p.m. a third robbery had been reported at the Ware's Market in Felton. On the way to Ware's, Fraley and Detective Mullett discussed whether O'Neil was a possible suspect in the two earlier robberies. Fraley was aware that O'Neil matched the description given by the victims as he had arrested O'Neil for committing several burglaries during the summer of 1994. Fraley further recalled that O'Neil frequently drove a Blue Chevrolet Cavalier which was owned by his girlfriend, Dana Porter. In response to a request by Fraley, the Harrington Police Department drove by the Porter residence to determine whether the vehicle was present. The vehicle was not found at that location.

Once at Ware's, Fraley was informed that at 9:00 p.m. Mr. Ware had been placing a cash box into his van when he was approached by a heavy-set white male wearing a ski mask and a dark colored sweatshirt. The man displayed an automatic weapon and demanded the money contained in the cash box. As Ware was preparing to hand over the cash, a car pulled into the parking lot and apparently frightened the perpetrator who fled the scene. Based on the robber's stocky build, Ware thought that he had seen him before in the store as well as around town with a local resident named Eric Darling. Fraley was aware that O'Neil was an associate of Darling and that Darling lived approxi-

mately 750 feet from Ware's Market. At this point Fraley, convinced that O'Neil was the perpetrator of the three robberies, put out a general broadcast for O'Neil and the blue Cavalier automobile.

Alerted by the general broadcast, Corporal Charles McCall, Jr. ("McCall") of the State Police, noticed a Chevrolet Cavalier outside the Canterbury Shore Stop, a convenience store. While watching from a distance, he witnessed two male subjects leave the store and enter the vehicle. McCall then approached and asked for identification. The two individuals initially hesitated but then identified themselves as O'Neil and Wilmer Harmon ("Harmon"). O'Neil was immediately arrested and a subsequent pat-down search revealed a man's gold ring set with several rows of diamonds. This ring was later identified by Mr. Theodorakos as the one stolen from his residence. At the time of his arrest O'Neil was wearing jeans and a t-shirt, stood 5'9" tall, and weighed 230 pounds.

Harmon, a twice convicted felon, decided to cooperate with police by providing incriminating information about O'Neil. He told police that he had been with O'Neil since approximately 8:30 p.m. that evening and had acted as the lookout during the attempted robbery of Ware's Market. Following the robbery, the two men fled to the home of Holly Castell where they stayed for a few moments before returning to Eric Darling's house. Once at the Darling home, the two men went upstairs so that O'Neil could change his jacket prior to driving to the Shore Stop. A subsequent search of the Darling home revealed a black hooded sweatshirt in the upstairs bedroom. Similarly, Holly Castell discovered a dark colored ski mask in her upstairs closet which she later turned over to police. Both items were introduced into evidence at the criminal trial.

The State also offered the testimony of Dana Porter who stated that, on the morning following his arrest, O'Neil called her and asked if she would dispose of a gun which he had hidden in the Darling's backyard. At O'Neil's request, Porter, Eric Darling and a friend disposed of the gun by throwing it into a lake in Felton. A search of the lake by police failed to recover the weapon. With little physical evidence linking O'Neil to the crimes the State relied upon circumstantial evidence in proving its case. The jury found O'Neil guilty of the Theodorakos and Ware's Market robberies, but acquitted him of the crimes committed at Marvel's Liquor Store.

## II

O'Neil's principal claim of error concerns the State's failure to turn over exculpatory information to the defense prior to an evidentiary suppression hearing. On July 20, 1995, O'Neil's counsel filed a motion seeking to suppress evidence which was obtained during the post-arrest search of O'Neil by Corporal McCall. In anticipation of the suppression hearing O'Neil filed a discovery request seeking any and all exculpatory material in the State's possession. The State's response to this request was that "[such] material, if any, would be provided at trial."

The central issue raised at the suppression hearing was whether the police lacked probable cause to arrest O'Neil, thus invalidating the seizure of the diamond ring from his person. *See Rickards v. State*, Del.Supr., 77 A.2d 199 (1950). At the suppression hearing, the State sought to satisfy its burden of establishing probable cause, in part, through the testimony of Detective Mullet. Mullet, who interviewed Nicholas Theodorakos, testified that Nicholas was able to provide a partial description of the intruder and that, based on her son's description, Mrs. Theodorakos believed the intruder "sounded like O'Neil." Although the State was aware that Nicholas had initially suspected the perpetrator was his friend Eric, they chose not to release this information to the defense based on a narrow view of their discovery obligations.[1] O'Neil contends that Nicholas' initial reaction, that his friend Eric was playing a joke, undermines his latter description of the intruder and thereby weakens Mrs.

---

1. Defense counsel was not made aware of Nicholas' equivocal identification until the prosecutor's opening remarks at the criminal trial. During the trial, however, the defense was able to fully explore the issues surrounding Nicholas' full statement through cross-examination of Mullett.

Theodorakos' conclusion that O'Neil was the perpetrator. The withholding of Nicholas' full statement, it is argued, denied O'Neil the opportunity to fully explore the issue of probable cause and therefore, he is entitled, at a minimum, to a new suppression hearing.

It is well settled law that the State's failure to turn over evidence favorable to an accused upon request violates due process "where the evidence is material either to guilt or to punishment...." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963). The State does not dispute this affirmative obligation under *Brady* and its progeny, but argues that the accused's entitlement to exculpatory information does not materialize until the trial itself, *i.e.*, until the guilt/innocence phase. We do not agree with the State's narrow interpretation of its *Brady* obligation. We reaffirm our previous holding that the obligation to disclose exculpatory information is triggered by the defendant's request pursuant to Super.Ct.Crim.Rule 16 and is not limited to trial proceedings. *Pierson v. State*, Del. Supr., 351 A.2d 860 (1976). To withhold exculpatory information at the earlier stages of a criminal prosecution, equally deprives the defendant of an opportunity to vindicate a possible deprivation of his constitutional guarantees.

Although Nicholas' identification is arguably not exculpatory, we find it is sufficiently relevant to the issue of probable cause so as to fall under the purview of *Brady* material. Therefore, under the rule announced in *Pierson* and reaffirmed in this opinion, the State's failure to release Nicholas' full statement was a violation of O'Neil's rights under *Brady*. This violation, however, does not warrant a new suppression hearing. In conducting a *de novo* probable cause analysis, we conclude that, despite the equivocal statement, other evidence exists which amply supports a finding that the police had sufficient probable cause to arrest O'Neil. Thus we find the *Brady* violation to be harmless error.

A police officer is empowered to make a warrantless arrest for any felony, if he has "reasonable grounds" to believe the person to be arrested has committed the crime. 11 *Del.C.* § 1904. This Court has interpreted the term "reasonable grounds" to be synonymous with probable cause. *Thomas v. State*, Del.Supr., 467 A.2d 954, 957 n. 3 (1983). Following an arrest, the officer is permitted to search the individual in order to remove any potentially dangerous instrumentality and to preserve evidence. *Chimel v. State of California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Here Mr. Theodorakos' ring was seized as evidence by Officer McCall during a search incident to O'Neil's arrest. Thus the dispositive question is whether police had probable cause to suspect that O'Neil had participated in one or more of the robberies committed on the evening of November 11, 1994.

"Probable cause is an elusive concept which avoids precise definition.... It lies somewhere between suspicion and sufficient evidence to convict." *Jackson v. State*, Del.Supr., 643 A.2d 1360, 1365 (1994) (quoting *Thompson v. State*, Del.Supr., 539 A.2d 1052, 1055 (1988)). For this reason, probable cause is measured by the totality of the circumstances through a case by case review of "the factual and practical considerations of everyday life on which reasonable and prudent men [act]." *State v. Maxwell*, Del. Supr., 624 A.2d 926, 928 (1993). The scope of the information used to formulate probable cause is quite broad. This Court has noted that:

> [p]robable cause can be established from either direct observation or hearsay. The latter, consisting generally of incriminatory reports to the police by informants or witnesses, is acceptable, provided that it is sufficiently corroborated by other facts within the officer's knowledge.

*Garner v. State*, Del.Supr., 314 A.2d 908, 911 (1973).

In its suppression ruling, the Superior Court found that at the time of the broadcast which sought the apprehension of O'Neil, the police were in possession of the following facts:

a. Three persons had given a description of the perpetrator as being 5′9″ to 5′11″ tall and being heavily built or

heavy set. Two of them described him as white. This fit the defendant's general physical description which was known by police from their independent acquaintance with defendant. He was described as wearing a black hooded sweatshirt and dark pants and carrying a black handgun.

b. Mrs. Theodorakos mentioned Brian O'Neil as a suspect since he fit that description, was familiar with the location of their home, had been suspected of previously stealing from her business, and had a motive to raise $2,000 fast.

c. Brian O'Neil was known by the police to be unemployed and was known to have a past criminal history including burglaries and theft.

d. The car he drove was not at its owner's house

e. Mr. Ware said that he had seen the perpetrator before in the company of Eric Darling and the police knew the defendant to be an associate of Eric Darling who lived a short distance from Ware's Market.

Despite the defendant's arguments to the contrary, Nicholas Theodorakos' full statement does not alter the total mix of information to a degree which reduces the sufficiency of probable cause to support an arrest. Nicholas did not identify his friend Eric as the perpetrator. Rather, he suspected a joke was being played upon him until it became evident that a crime was being committed. This initial reaction does not so markedly undermine the subsequent physical description as to invalidate his mother's conclusion that O'Neil was the perpetrator. Moreover, Mrs. Theodorakos' identification of O'Neil was sufficiently corroborated by other facts within the independent knowledge of the police. The totality of the circumstances known to the police support a strong probability that O'Neil committed one or more of the robberies in question. Accordingly, the motion to suppress evidence was properly denied.

### III

O'Neil raises three additional issues which he alleges constituted error and effectively deprived him of a fair trial. He claims as error: (1) the Superior Court's ruling which allowed the State to amend the Information during the course of trial; (2) The court's failure to grant his motion for judgment of acquittal on the charge of burglary in the first degree; and (3) remarks made by the prosecution during summation which, O'Neil contends, improperly shifted the burden of proof onto the defense. After careful consideration of the record, we find no substance to O'Neil's remaining claims.

### A.

Prior to the conclusion of the State's case in chief, the prosecution made a motion to amend the Information with regards to the caliber of the weapon used in the robberies. The motion, which was granted by the court, changed the description of the weapon from a ".32 caliber semi-automatic" to a "semi-automatic" gun. O'Neil argues that the amendment prejudiced his case because his defense was based on the allegation that a .32 caliber weapon had been used to commit the crimes. Delaware Superior Court Criminal Rule 7(e) permits an Information to be amended at any time before a verdict so long as no additional or different offense is charged and if the substantial rights of the accused are not prejudiced. The Superior Court correctly concluded that the caliber of weapon constituted surplusage since it was not an essential element of the offenses charged. The court further noted that the amended Information was not prejudicial to O'Neil nor did it preclude him from pursuing his original defense strategy. We see no basis for disturbing that ruling.

### B.

O'Neil further alleges that the lower court erred by failing to grant his motion for a judgment of acquittal. O'Neil contends that the State failed to establish beyond a reasonable doubt the elements of burglary in the first degree because it was unable to prove at trial that the weapon used by O'Neil

was capable of firing a projectile.[2] This argument is controlled by our prior decision in *Desmond v. State,* Del.Supr., 654 A.2d 821 (1994). In *Desmond,* we concluded that the State need not recover a weapon, nor must the weapon have been discharged during the commission of the predicate felony for a defendant to be found guilty of possessing a deadly weapon. *Id.* at 829. The relevant question is not whether a weapon was produced at trial, but whether a rational trier of fact could conclude that O'Neil possessed a deadly weapon during the commission of the burglary. *Williams v. State,* Del.Supr., 539 A.2d 164, 168 (1988). Viewing all of the evidence in the light most favorable to the State we answer this question in the affirmative.

### C.

■ Finally, O'Neil alleges that certain comments made by the prosecution during its closing arguments were improper and had the effect of shifting the burden of proof to O'Neil to establish his innocence. During his summation, defense counsel focused on the State's failure to have Mr. Theodorakos try on the diamond ring and on its decision not to have a witness identify the mask found in Castell's bedroom closest. In response to these comments the prosecutor, in rebuttal, stated that the defense did not ask Mr. Theodorakos to try on the ring because he knew the ring would have fit. The prosecutor also told the jury that he did not ask the witness

to identify the mask because he anticipated that defense counsel would have objected. The Superior Court upheld an objection as to the prosecutor's comment concerning the mask and instructed the jury to disregard it.

In light of the evidence presented and the argument put forth by defense counsel, we find the prosecutor's statements to be within the acceptable range of fair rebuttal comment. The remarks did not impermissibly shift the burden of proof or place O'Neil in the position of proving his innocence. Rather, they were made to remedy alleged infirmities in the State's case by drawing the jury's attention to other reasonable inferences to be drawn from the evidence. As we have stated in the past, "the prosecution may fairly attempt to neutralize strident defense arguments in the same manner as they were made." *Hooks v. State,* Del.Supr., 416 A.2d 189, 205 (1980). The statements in question did not serve to shift the burden of proof and do not warrant reversal.

\*　　\*　　\*　　\*　　\*　　\*

The judgment of the Superior Court is AFFIRMED.

---

**2.** An essential element of burglary in the first degree is that the defendant must be armed with a deadly weapon. 11 *Del.C.* § 826. Included under the definition of a deadly weapon is a firearm capable of discharging a projectile. 11 *Del.C.* § 222(10).