# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,      )
     )
     )
     )
v.      )     Case ID No.:     1808009089
     )
AVORERY BROWN,      )
     )
     )
Defendant.      )

## MEMORANDUM OPINION AND ORDER

Submitted: January 28, 2019
Decided: February 28, 2019

*Upon Consideration of Defendant's Motion to Transfer Charges to Family Court,*
**GRANTED.**

Allison Abessinio, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware. *Attorney for the State.*

Patrick J. Collins, Esquire, Collins & Associates, Wilmington, Delaware. *Attorney for the Defendant.*

**MEDINILLA, J.**

# I. INTRODUCTION

Avorery Brown[1] ("Defendant") faces charges for alleged criminal conduct that occurred when he was sixteen years old[2] related to two separate robberies and his actions following the death of his twelve-year old brother. The charges include two counts of Robbery First Degree, two counts of Possession of a Firearm During the Commission of a Felony ("PFDCF"), two counts of Possession or Control of a Firearm by a Person Prohibited ("PFBPP"), two counts of Conspiracy Second Degree, and one count of Tampering with Physical Evidence.[3]

Defendant filed this Motion to Transfer Charges to Family Court under 10 *Del. C.* § 1011 and the recently amended 11 *Del. C.* § 1447A. After consideration of the parties' submissions, oral arguments, and the record in this case, the Court finds that the State has not established proof positive or presumption great that Defendant used or displayed a firearm during the commission of the respective felonies to establish a fair likelihood of conviction for the firearm charges under 11 *Del. C.* § 1447A(f), and that both the preliminary considerations and enumerated factors under 10 *Del. C.* § 1011(b) weigh in favor of transfer. Therefore, Defendant's Motion to Transfer Charges to Family Court is **GRANTED**.

---

[1] The correct spelling of Avery Brown is Avorery Brown, as provided by defense counsel's submissions.

[2] Defendant's date of birth is July 21, 2002.

[3] *State v. Brown*, Crim. I.D. No. 1808009089, D.I. #8 (Del. Super. Oct. 22, 2018).

## II.   FACTUAL AND PROCEDURAL HISTORY[4]

Defendant's juvenile criminal history is only two years old, beginning when he was approximately fourteen years old.   Unfortunately, all divisions of the Department of Services for Children, Youth and Their Families ("DSCYF") were involved in his life.  Since age four, between 2006 and 2016, Defendant has been on the DFS radar and his family has been investigated on five separate occasions.[5]  On May 11, 2016, a Hotline Abuse Report was filed which alleged that his mother was whipping her children.[6]  DFS investigated the allegations of child abuse, and confirmed the abuse against all seven children in the home.[7]  The DFS case was substantiated against his mother and she was also prosecuted by the State for her criminal conduct.[8]  DFS reports confirm all seven children were subjected to physical discipline with a cord and belt.  During their investigation, the children were separated from each other, removed from their mother's care, and Defendant was placed with his paternal grandmother and father.[9]  During this time period,

---

[4] The Court's recitation is based on the facts presented in the pleadings and the evidence presented at the reverse amenability hearing held on January 7, 2019 and January 28, 2019.

[5] *See* Report of Taunya Batista, M.A., Sentencing Advocate/Mitigation Specialist at 4-5 (submitted January 2, 2019) [hereinafter Batista's Report].

[6] *Id.* at 5.

[7] *Id.*

[8] *Id.*  Ms. Brown was found guilty of Assault Third Degree.

[9] *Id.* at 5-6.

3

Defendant often ran to Riverside to see his mother. Less than three months after being removed from his mother's care, Defendant had his first encounter with the juvenile justice system.[10] He was detained and participated in various programs through the DSCYF, specifically through the Division of Youth Rehabilitative Services ("YRS") for two felony and three misdemeanor adjudications.

On August 14, 2018, Defendant was arrested and charged in the Family Court for these robbery charges, and the companion firearm and person prohibited charges, as well as conspiracy.[11] The State decided instead to indict him in this Court on August 27, 2018.[12] On October 22, 2018, Defendant was re-indicted for Tampering with Physical Evidence related to an accidental shooting.[13] The shooting occurred on August 3, 2018 when Defendant's twelve-year-old brother died as a result of an accidental self-inflicted gunshot wound.[14] Through stipulation of the parties, the undisputed factual record reflects that at the time of the fatal shooting, Defendant was home during the incident, in a different room. Defendant told police he threw

---

[10] Batista's Report at 6.

[11] *State v. Brown*, Crim. I.D. No. 1808009089, D.I. #4, ¶ 1 (Del. Super. Sept. 14, 2018).

[12] *State v. Brown*, Crim. I.D. No. 1808009089, D.I. #1 (Del. Super. Aug. 27, 2018).

[13] *State v. Brown*, Crim. I.D. No. 1808009089, D.I. #8 (Del. Super. Oct. 22, 2018).

[14] *See State v. Brown*, Crim. I.D. No. 1808009089, D.I. #26, ¶ 1 (Del. Super. Jan. 28, 2019) [hereinafter Stipulation].

the gun out of a window and into a field.[15] Defendant denied that the gun was his.[16] A law enforcement officer observed Defendant running from and then returning to the home before police arrived to investigate Defendant's brother's death.[17] No firearm was ever recovered.

Defendant was arrested eleven days after his brother's death and has since been detained at the New Castle County Detention Center ("NCCDC"). This charge is also brought against Defendant on the theory that his consciousness of guilt establishes that the weapon he removed from his home was the same one he possessed in the two robberies on July 25 and 31 for which he stands charged. It is these robberies that were the focus of the evidence presented at the reverse amenability hearing.

The Court heard testimony from two State witnesses. The State called Wilmington Police Department officers, Master Corporal Jose Santana ("Santana") and Detective Steven Bender ("Bender") to testify about their respective robbery investigations of July 25 and July 31. Their responses on cross-examination prompted Defense counsel to seek a stay of the proceedings and a request was made

---

[15] Stipulation ¶ 2.

[16] *Id.*

[17] *Id.* ¶ 3.

for additional materials germane to the reverse amenability determination.[18] On January 17, this Court granted Defendant's request and, although challenged, the State eventually turned over the requested information.[19]

On January 28, 2019, the Court heard oral arguments and Defendant submitted an additional exhibit for the Court's consideration to include transcripts of the interviews of the two victims and one witness, the 911 call transcript, and the transcript of the testimony of the two officers from the reverse amenability hearing.[20] Defendant also introduced a "Confidential Report of Psychological Evaluation" from licensed psychologist, Dr. Robin Belcher-Timme, Psy.D., and an "Amenability Report" prepared by Taunya Batista, M.A., a Sentencing Advocate/Mitigation Specialist.[21] Both opine a transfer to Family Court is warranted to further Defendant's rehabilitative efforts and ensure public safety.

---

[18] Defense counsel first became privy to this information at the reverse amenability hearing because Defendant was not provided with his preliminary hearing in Family Court. This was the result of Defense counsel's agreement to continue the hearing at the State's request, and then the State's refusal to reciprocate Defendant's request for a one-week postponement of the Grand Jury proceedings that would have allowed the preliminary hearing to go forward.

[19] *See generally State v. Brown*, Crim. I.D. No. 1808009089, D.I. #22 (Del. Super. Jan. 17, 2019)

[20] Reverse Amenability Hearing Exhibit: Relevant Transcripts, *State v. Brown*, Crim. ID No. 1808009089 (Del. Super. Jan. 28, 2019) [hereinafter Def.'s Ex. at A___].

[21] *See generally* Report of Robin Belcher-Timme, Psy.D., ABPP, Licensed Psychologist (submitted January 3, 2019) [hereinafter Timme's Report]; Batista's Report.

The State's evidence included a "Reverse Amenability Report" from Jennifer Skinner, a Family Service Specialist Supervisor for YRS.[22] She recommended that Defendant remain in this Court because this Court had exclusive jurisdiction of the firearm charges. As the law has changed, this is no longer the case. The matter is now ripe for review.

## III. STANDARD OF REVIEW

The reverse amenability process is meant to identify those juveniles charged as adults who are amenable to the rehabilitative processes of the Family Court.[23] If the juvenile files a motion to transfer the adult charges, this Court must hold a reverse amenability hearing and weigh the four factors set forth in 10 *Del. C.* § 1011(b).[24]

Under § 1011(b), the Court may consider evidence of: (1) "[t]he nature of the present offense and the extent and nature of the defendant's prior record, if any;" (2) "[t]he nature of past treatment and rehabilitative efforts and the nature of the defendant's response thereto, if any;" (3) "[w]hether the interests of society and the

---

[22] *See generally* Report of Jennifer Skinner, Family Service Specialist Supervisor, YRS (submitted November 16, 2018) [hereinafter Skinner's Report].

[23] *See generally* 10 *Del. C.* §§ 1010-11. *See Hughes v. State*, 653 A.2d 241, 249 (Del. 1994) (quoting *Marine v. State*, 624 A.2d 1181, 1184 (Del. 1993) [hereinafter *Marine II*]; *Marine v. State*, 607 A.2d 1185, 1209 (Del. 1992) [hereinafter *Marine I*]).

[24] *See, e.g., State v. Harper*, 2014 WL 1303012, at *5–7 (Del. Super. Mar. 31, 2014).

defendant would be best served by trial in the Family Court or in the Superior Court;" and any "other factors which, in the judgment of the Court are deemed relevant."[25]

Before weighing the § 1011(b) factors, "the Court must preliminarily determine whether the State has made out a *prima facie* case against the juvenile, meaning whether there is a fair likelihood that [the defendant] will be convicted of the crimes charged."[26] There is a fair likelihood that the defendant will be convicted if, after reviewing the totality of the evidence presented, it appears that, if the defense does not sufficiently rebut the State's evidence, "the likelihood of a conviction is real. . . ."[27] The Supreme Court has previously explained that the type of hearing required under § 1011(b) "requires the Superior Court to conduct an investigation *akin to a proof positive hearing*…[which has] a purpose analogous to the reverse amenability hearing."[28]

Further, 11 *Del. C.* § 1447A(f) no longer mandates that PFDCF charges remain under the exclusive jurisdiction of the Superior Court for juvenile offenders.[29] As amended:

---

[25] 10 *Del. C.* § 1011(b).

[26] *Harper*, 2014 WL 1303012, at *5 (citing *Marine II*, 624 A.2d at 1185).

[27] *State v. Mayhall*, 659 A.2d 790, 792 (Del. Super. 1995).

[28] *Marine I*, 607 A.2d at 1211-12. (emphasis added)

[29] 11 *Del. C.* § 1447A(f) (2018).

8

Every person charged under this section over the age of 16 years who, following an evidentiary hearing where the Superior Court finds proof positive or presumption great that the accused used, displayed, or discharged a firearm during the commission of a Title 11 or a Title 31 violent felony as set forth in § 4201 (c) of this title, shall be tried as an adult, notwithstanding any contrary provisions or statutes governing the Family Court or any other state law. The provisions of this section notwithstanding, the Attorney General may elect to proceed in Family Court.[30]

The amendment entitles a juvenile defendant to an evidentiary hearing and allows the firearm charges to be transferred back to Family Court if the Court does not find proof positive or presumption great that the juvenile used, displayed, or discharged a firearm during the commission of a felony.[31] The proof positive or presumption great standard is commonly understood as whether "after [a] full hearing there is good ground to doubt the truth of the accusation."[32] If so, then "the Court in its discretion [may] conclude[] from the evidence that the State does not have a fair likelihood of convicting the accused of the…offense."[33]

---

[30] 11 *Del. C.* § 1447A (f) (2018).

[31] *Id.*

[32] *See In re Steigler*, 250 A.2d 379, 382 (Del. 1969) (internal quotations omitted).

[33] *Id.* at 383. The Court noted that the proof positive or presumption great language is imprecise.

## IV. DISCUSSION

### A. Proof Positive or Presumption Great – Fair Likelihood of Conviction

#### 1. Identification of Defendant

Under 10 *Del. C.* § 1011(b), the State acknowledges that to make out its *prima facie* case for Robbery First Degree and the companion firearm charges, it relies heavily upon the victims' testimony and their accounts to identify Defendant as the perpetrator of each robbery. The State is required to "prove each element of the offense beyond a reasonable doubt, including that the defendant was the person who committed the offense."[34] The test for determining identity is "whether 'the [trier of fact] could rationally [find] sufficient evidence to conclude beyond a reasonable doubt' that the defendant committed the crime charged."[35] The totality of the evidence for each robbery is riddled with issues and demonstrates significant weaknesses in the State's *prima facie* case.

#### Identification of July 25 Robbery

Master Corporal Santana testified that on July 25, 2018, two juvenile males approached a victim ("Victim 1") in the area of 27th Street and Claymont Street. According to the victim, he was to provide his friend a ride to purchase drugs. Two

---

[34] *McDonald v. State*, 147 A.3d 748, 2016 WL 4699155, at *2 (Del. Sept. 7, 2016) (TABLE) (internal citations omitted).

[35] *Id.* (quoting *Vincent v. State*, 996 A.2d 777, 779 (Del. 2010)).

10

young males approached his vehicle and brandished firearms. One juvenile demanded he turn over everything he had and forcibly removed the victim's necklace, cell phone, and wallet. The same juvenile told him he had "five seconds" to flee the area. Victim 1 immediately reported the incident. His wife used a phone finder and WPD located two suspects. Both suspects were detained by WPD but Victim 1 reported that they were not the juveniles that robbed him. The second juvenile was never apprehended. No other eyewitnesses were available. The victim described the gun as black in color but no firearm was recovered.

Approximately three weeks later, on August 15, 2018, Santana interviewed Victim 1. He told the officer that he recognized the juveniles as two kids who lived in the neighborhood. He also told Santana that he spoke to other people in the neighborhood and conducted his own independent investigation to try to identify the suspects.[36] Santana then administered a photo line-up to Victim 1 and provided three or four photo arrays.

Santana testified that he followed the policies employed by the WPD that permit the same person to both populate and administer the photo array to the victim. On cross-examination, he acknowledged this practice is apparently counter to the "joint model policies for custodial interrogations and eyewitness identifications"

---

[36] Def.'s Ex. at A4-5, Tr. of Interview of Victim 1 by Santana at 4-5.

promulgated by the Department of Justice ("DOJ") and the Delaware Police Chiefs Council.[37] Santana conceded that he was not familiar with the joint policies. He agreed that the WPD policy was at odds with what the joint policies consider "best practices," but stated his process is efficient and in accordance with the WPD policy. He did not have the policy available to offer additional comment.

During the photo lineup with the Victim 1, Santana explained that the person the victim identified has "already been picked up for something."[38] Santana and the victim discussed others who were possibly robbed and Santana stated "And now he's got your case and, you know, obviously, we'd be – we'd be interested in putting more cases on him[,]"[39] referencing the person the victim identified from the photo lineup. Santana explained that the victim may want to let these other people know that "something's already going and it could help" if they reached out to police.[40]

### Identification of July 31 Robbery

Detective Bender testified that on July 31, 2018, a victim ("Victim 2") reported she was approached by two young black juveniles while responding to a food delivery call at 1200 East 22nd Street. One was wearing a ski mask. She alleged

---

[37] Def.'s Ex. at A53-54, Tr. of Reverse Amenability Hearing on Jan. 7, 2019 at 19-24.

[38] Def.'s Ex. at A5, Tr. of Interview of Victim 1 by Santana at 5.

[39] *Id.*

[40] Def.'s Ex. at A6, Tr. of Interview of Victim 1 by Santana at 6.

that the person without the ski mask ordered her "to give it up," with a countdown from "5 seconds" to flee.[41] She relinquished $56 and a can of soda. According to Bender, Victim 2 described this individual as a shorter black male with possibly a small afro with curly hair, and he was wearing all black clothing. Another eyewitness advised the investigating officers that two young black males were seen running down 22nd Street, where one dropped a sweatshirt, and one was overheard to say that they "got the money and the drugs."[42] Nothing related to drugs was mentioned by the victim.

Victim 2 believed that the persons who robbed her frequented the area of 27th Street and Claymont Street so WPD patrol officers immediately responded to the area and conducted a pedestrian stop of Defendant and another male individual. WPD officer ordered Defendant to be photographed in front of a police vehicle and sent the photo via text message to Sergeant Saunders who was conducting his investigation with Victim 2 at her place of employment. When shown the photo, she was unable to positively identify Defendant as the person who robbed her.[43]

---

[41] Def.'s Ex. at A26-27, Tr. of Interview of Victim 2 by Bender at 4-5.

[42] Def.'s Ex. at A15, Tr. of Interview of eyewitness at 5.

[43] When shown the photograph, the officer with the victim memorialized in his report that she thought "[Defendant] may have been involved but was unsure."

Surveillance videos from the surrounding areas proved unsuccessful in identifying the Defendant.

Detective Bender also created and administered a photo array. Unaware of any particular WPD policy related to photo identification, he used an entirely different approach. Instead of using a standard "six-pack" array with a single sheet, he selected 20 photos of known juvenile suspects from an "Intelligence Bulletin" in the Riverside area, included Defendant, and presented Victim 2 with 20 single 8x10 black and white photographs. He conceded that no consideration was given to provide the victim with photos of individuals with similar traits.

Victim 2 stated that the suspect without the mask displayed and used a gun and she was unsure if the juvenile with the ski mask possessed a gun.[44] When shown the photo line-up, Victim 2 identified Defendant as the one without the ski mask, who also had the gun.[45] But when asked if she had been shown his picture before— the aforementioned photo taken on the day of the robbery against the police vehicle—she stated "[a]nd I had said that that was…the one in the ski mask. But he. His face looked like he was the one that was right here."[46] When asked if Defendant

---

[44] Def.'s Ex. at A28, Tr. of Interview of Victim 2 by Bender at 6.

[45] Def.'s Ex. at A31, Tr. of Interview of Victim 2 by Bender at 9.

[46] Def.'s Ex. at A32, Tr. of Interview of Victim 2 by Bender at 10.

was the one without the mask and with the gun, she stated "uh-huh."[47] Bender then states, "All right. Fair enough. I mean that –that works for me." To which she says "But I was so scared. I thought he had like longer hair."[48] Also, she indicated that a woman from the Riverside area may have been involved and that she has seen this woman talking to the boy she identified from the photos.[49] No woman or other juvenile was apprehended.

Victim 2 provides different statements about whether Defendant was the one with or without the gun, and with or without the ski mask. It is unclear. So, too, when asked to describe the gun, she conceded she did not know guns. When interviewed, she described it as a silver or dirty silver color,[50] inconsistent with her description on the 911 call when she describes the gun as "blackish, like a dirty brownish."[51] Two houses from where the robbery occurred, patrol officers located a toy gun, and it was shown to her via a video chat application on the officers' phones. For unknown reasons, WPD discarded the toy gun after Victim 2 confirmed

---

[47] Def.'s Ex. at A31, Tr. of Interview of Victim 2 by Bender at 9.

[48] Def.'s Ex. at A42, Tr. of Interview of Victim 2 by Bender at 20.

[49] Def.'s Ex. at A30-31, 33-34, Tr. of Interview of Victim 2 by Bender at 8-9, 11-12.

[50] Def.'s Ex. at A27, Tr. of Interview of Victim 2 by Bender at 5.

[51] Def.'s Ex. at A61, Tr. of Reverse Amenability Hearing on Jan. 7, 2019 at 50.

that the gun was too small to be the one used in the robbery. No firearm was recovered.

It is not appropriate for this Court to determine issues of admissibility at this juncture, or whether the WPD employed appropriate protocol in its population or administration of the arrays used to identify Defendant. The Court does not have to decide whether the identification procedures were impermissibly suggestive.[52] However, even if admissible, the Court may weigh the totality of the evidence.

Master Corporal Santana's statements to the victim that Defendant had "already been picked up" for other crimes, and asking for assistance to charge him for more may face challenges. Whether or not impermissibly suggestive, the process and his statements may undermine the admissibility of an in-court identification. Detective Bender's use of a wholly different approach to select only the juveniles from the Riverside area crime bulletin, without consideration to similar traits, may also raise issues regarding the identification.

---

[52] "An identification procedure will not pass constitutional muster where it is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Younger v. State*, 496 A.2d 546, 550 (Del. 1985) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). *See also Harris v. State*, 350 A.2d 768, 771 (Del. 1975). "That a confrontation is suggestive, without more, however, cannot amount to a due process violation; the unnecessarily suggestive identification procedure must also carry with it the increased danger of an irreparable misidentification." *Younger*, 496 A.2d at 550 (citing *Manson v. Brathwaite*, 432 U.S. 98 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972)). *See also Harris*, 350 A.2d at 770-72; *Anderson v. State*, 452 A.2d 955, 956 (Del. 1982).

Although the victims may have eventually been certain they identified the Defendant in the robberies, there is also evidence that questions the processes employed by WPD to obtain these identifications. This is coupled with the facts that Victim 1 conducted his own independent investigation and WPD waited several weeks to present him with a photo line-up only to then offer improper confirmatory statements. Victim 2's versions were inconsistent both with respect to the weapon she saw and the individual she identified, after initially stating she was uncertain that Defendant was the person who robbed her. The State struggles to make out a *prima facie* case on the identification of Defendant.

### 2. Possession of the Firearm

Under 11 *Del. C.* § 1447A(f), even if the State could overcome the factual and legal hurdles to introduce evidence that Defendant was indeed the perpetrator of either robbery, this Court must find proof positive or presumption great that Defendant "used, displayed or discharged" a firearm during the commission of these felony robberies to maintain jurisdiction of the PFDCF charges.

No firearms were recovered in this case. The WPD tossed the only evidence of a gun that may have been used in one robbery, albeit a toy gun. It is true that a "firearm need not be recovered to support a jury finding that a defendant possessed

17

a firearm during the commission of a felony."[53] However, the State must establish through direct or circumstantial evidence that there was, in fact, a firearm.[54] Under either a proof positive standard (that Defendant used, displayed or discharged) or beyond a reasonable doubt standard (that Defendant possessed), the State must establish evidence of a firearm.[55]

Since the State was unable to locate any firearms or other physical evidence to prove that the weapons used in the robberies were actual firearms, it intends to rely upon Defendant's possession of *an* actual firearm in the accidental shooting to establish he also possessed a firearm during the commission of the robberies. Defendant's conduct immediately following his brother's accidental shooting is intended to demonstrate a consciousness of guilt to suggest that he had no reason to

---

[53] *Cruz-Urvina v. State*, 125 A.3d 1100, 2015 WL 5824796, at *2 (Del. Oct. 2, 2015) (TABLE) (citing *Poon v. State*, 880 A.2d 236, 238 (Del. 2005)).

[54] *See Desmond v. State*, 654 A.2d 821, 829 (Del. 1994) (finding there was substantial similarity in the witnesses' descriptions of the weapon that "enabled a rational trier of fact to conclude that what Desmond appeared to possess was, in fact, a deadly weapon"). The witnesses in *Desmond* "viewed the weapon at close range and for extended periods of time." *Id. See also Carter v. State*, 105 A.3d 988, 2014 WL 7010032, at *2 (Del. Nov. 12, 2014) (TABLE) (holding that there was sufficient evidence to support defendant's conviction for PFDCF even though State did not recover gun or physical evidence). In *Carter*, there was evidence that the defendant shot a gun into the air through police reports, testimony from neighbors that they heard gunshots, and the defendant own statements to police confirmed he shot a gun. *Id.*

[55] A firearm is defined as "any weapon from which a shot, projectile or other object may be discharged by force of combustion, explosive, gas and/or mechanical means, whether operable or inoperable, loaded or unloaded." 11 *Del. C.* § 222(12). A firearm does not include a BB gun.

throw away the weapon unless it was somehow connected to prior criminal acts (i.e, the robberies).

The State might be able to introduce this evidence to support Defendant's consciousness of guilt. Certainly, Defendant's response of discarding the weapon might resonate with a jury to suggest culpability of some sort. But the State posits that the weapon used in the accidental shooting was the same brandished in the robberies. The weaknesses in the State's case are two-fold: the descriptions of the weapons by the victims vary and are also inconsistent,[56] and there was no description offered regarding the firearm used in the accidental shooting.

Here, in order for the State to prove its theory, a jury could possibly find that the robbery weapons were one in the same after reconciling the disparate descriptions offered by the victims. It is true the Supreme Court has held that "[m]ere testimony, even when it is conflicting, has been sufficient to allow a jury to find that a defendant possessed a firearm while committing a felony."[57] Here, just as in *Poon v. State*, there was no firearm recovered.[58] In *Poon,* though, the only issue raised was that there was conflicting testimony by the eyewitnesses about the

---

[56] The victim in the first robbery indicates that one of the two guns was black. The second victim provides that the firearm she saw was silver, or dirty silver/blackish-brown.

[57] *Cruz-Urvina*, 2015 WL 5824796, at *2 (citing *Poon*, 880 A.2d at 239).

[58] *Poon*, 880 A.2d at 238-39.

details of that particular weapon; one testified it was a "TEC-9", while the other a 9mm. or .45 cal. semi-automatic. There, the Supreme Court held "it [is] the jury's prerogative to resolve these conflicts."[59] Similarly, in *Cruz-Urvina v. State*, the Supreme Court found that "[i]t was for the jury to determine whether to credit the testimony and conclude that all of the evidence established that [the defendant] was guilty of PFDCF."[60] Alternatively, a jury might not be able to reconcile the victims' accounts to conclude it was the same weapon. It need not do so. A jury could just as well find the evidence stronger as to one robbery and conclude that Defendant was guilty of one, but not both. Even so, regardless of whether a jury returned a finding of guilt as to one or both robberies, in order to convict on the firearm charges, it would have to infer that *that* weapon possessed during either robbery was an actual firearm, as either the same or one similar to the one discarded by Defendant days later. Assuming they identified Defendant as the person who committed either robbery, a jury would need to take several factual leaps to find beyond a reasonable doubt that Defendant also possessed an actual firearm during the commission of either robbery.

---

[59] *Poon*, 880 A.2d at 239 (citing *Chao v. State*, 604 A.2d 1351, 1363 (Del. 1992)).

[60] *Cruz-Urvina*, 2015 WL 5824796, at *3. Although a firearm was not recovered in *Cruz-Urvina*, the police found items related to firearms in his room. *Id.* at *1. These items included hollow-point bullets, a revolver holster, and a revolver speed loader, which were presented as circumstantial evidence. *Id.* at *3.

At this juncture and on the State's theory, under 11 *Del. C.* § 1447A(f), this Court uses its discretion to find there is not proof positive or presumption great that this juvenile used, displayed, or discharged a firearm during the commission of a felony.[61] Therefore, the State has not demonstrated a fair likelihood of conviction for PFDCF. For the remaining charges, the State has not demonstrated a fair likelihood of conviction under 10 *Del. C.* § 1011, except that the State has met its *prima facie* burden on the charge of Tampering with Physical Evidence, as stipulated. The Court considers the factors under § 1011(b) and finds they weigh in favor of transfer.

## B. Weighing §1011(b)'s Four Factors

### 1. Section 1011(b) Factor One: Nature of Present Offense and the Extent and Nature of Defendant's Prior Record

The nature of the present offense and the nature of Defendant's prior record weigh against a transfer. Both sets of robbery charges are serious due to their violent nature and severity. The extent and nature of Defendant's prior record was escalating. His record includes two prior adjudications of delinquency as a juvenile. At age 14 years old, he pled guilty to Robbery Second, Conspiracy Second Degree, and Conspiracy Third Degree. After receiving 12 months of Level 3 supervision, he was successfully discharged from probation. He was then adjudicated delinquent of

---

[61] 11 *Del. C.* § 1447A(f) (2018).

Conspiracy Third Degree and Resisting Arrest and received 12 months of community supervision. While detained for these pending charges, Defendant was involved in an incident at the NCCDC on August 21, 2018. He is charged with Conspiracy Third Degree and Offensive Touching, and that case is also pending in Family Court. As to both prongs of factor one, the Court finds that they weigh against transfer.

## 2. Section 1011(b) Factor Two: Nature of Past Treatment and Defendant's Response

Defendant has previously shown he is amenable to Family Court sanctions since he has successfully completed recommended programming.[62] After Defendant's first juvenile adjudication, Defendant underwent an evaluation through Dr. Ben Lungen, a licensed psychologist employed by the Division of Prevention and Behavioral Health Services ("DPBHS").[63] Defendant was diagnosed with Disruptive Behavior Disorder.[64] He successfully completed Multi-Systemic Family Therapy in November of 2017 and completed the VisionQuest program in December of 2017.[65] He was successfully discharged from juvenile probation for his first

---

[62] Batista's Report at 8.

[63] *Id.*

[64] *Id.*

[65] *Id.*

22

delinquent adjudication.[66] Defendant worked with VisionQuest again after his second juvenile adjudication.[67] Since his initial incident at NCCDC while being detained on the current charges, Defendant has not had further problems.[68] Dr. Timme opined that programs are available through the Family Court and YRS which could meet Defendant's clinical and rehabilitative needs.[69] No evidence was presented to rebut the opinions that Defendant has not exhausted all of the programs and rehabilitative services available in Family Court and would likely benefit from these programs, including being provided the opportunity to complete his education.[70] The second factor weighs in favor of transfer.

### 3. Section 1011(b) Factor Three: Interests of Society and Defendant

Although Defendant's behavior has escalated, he has complied with programming through Family Court. The interests of society are best served by providing Defendant with rehabilitative services rather than incarcerating him with adult offenders. It is also in the best interest of the Defendant to return to Family Court for counseling and rehabilitation. This factor weighs in favor of transfer.

---

[66] Batista's Report at 8

[67] Timme's Report at 7.

[68] *Id.*

[69] *Id.* at 15.

[70] Batista's report at 11.

#### 4. Section 1011(b)'s Catchall Provision: Any Factors Deemed Relevant

The accidental shooting on August 3, 2018 is a final factor. Dr. Timme and Ms. Batista report that Defendant has been deeply impacted by this tragedy and the difficulty of processing this loss. Dr. Timme performed a psychological evaluation on Defendant and found that he is "experiencing intense levels of irritability often seen in adolescents struggling with depressive features."[71] This is linked with the death of his younger brother and he may suffer from Posttraumatic Stress Disorder (PTSD) or a Depressive Disorder.[72] Defendant's experience of symptoms of depressed mood, sadness, irritability, and other features of depression "are unusual in terms of their duration and intensity."[73] There is structured treatment programming that can address his various issues, including grief counseling.[74] Treatment should be provided through DSCYF. This factor weighs in favor of transfer.

### V. CONCLUSION

The Court finds that the State has not established proof positive or presumption great that Defendant used or displayed a firearm during the commission

---

[71] Timme's Report at 9.

[72] Timme's Report at 10.

[73] *Id.* at 10.

[74] Batista's Report at 11.

of the respective felonies to establish a fair likelihood of conviction for the firearm charges under 11 *Del. C.* § 1447A(f), and that both the preliminary considerations and enumerated factors under 10 *Del. C.* § 1011(b) weigh in favor of transfer. Therefore, Defendant's Motion to Transfer Charges to Family Court is **GRANTED**.

      **IT IS SO ORDERED**.

_____
Judge Vivian L. Medinilla

oc:    Prothonotary
cc:    Defendant
       Allison Abessinio, Esquire
       Patrick J. Collins, Esquire
       Jennifer Skinner, Master Family Service Specialist