IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MURAD DIGGS, | § | |
| | § | No. 282, 2020 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No.   1904013820(N) |
| STATE OF DELAWARE, | § | 1810015149A(N) |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: May 26, 2021
Decided: July 27, 2021

Before **VALIHURA**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court. **AFFIRMED.**

Michael W. Modica, Esquire, Wilmington, Delaware, *for Appellant Murad Diggs*.

Elizabeth R. McFarlan, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Dover, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

Murad Diggs was convicted in the Superior Court of possession of a firearm by a person prohibited and possession of ammunition by a person prohibited.[1] In this direct appeal, Diggs claims that the Superior Court erred when it denied his motion to suppress the evidence seized from him—the firearm and ammunition—following an investigative detention and frisk that was, in Diggs's view, unsupported by reasonable suspicion. More specifically, Diggs challenges the court's conclusion that the tip upon which the police were acting came from a "citizen informant" and therefore was presumptively reliable. Diggs also contends that the Superior Court's suppression-hearing factual determinations were flawed because the court failed to draw a "lost and/or missing evidence"[2] inference as a result of the police's failure to collect and preserve certain evidence.

Although we agree, in part, with Diggs's criticism of the Superior Court's "citizen-informant" analysis, we disagree with his conclusion that his seizure was not supported by sufficient reasonable suspicion. Likewise, we reject Diggs's contention that the Superior Court's failure to draw an adverse inference against the

---

[1] According to Diggs's notice of appeal, his appeal encompasses a drug-dealing conviction in a separate prosecution under a separate indictment. But Diggs's briefs make no mention of the facts surrounding his drug-dealing conviction, nor do his legal arguments touch upon that charge. We therefore assume that the inclusion of that conviction in the notice of appeal was unintentional or, if it was not, that Diggs has abandoned that aspect of his appeal.

[2] Opening Br. at 38.

prosecution—an inference that Diggs did not urge the court to draw in the proceedings below—was plainly erroneous. Hence, we affirm.

## I.

## A.

On the date of Diggs's arrest, Corporal Alexander Marino of the Wilmington Police Department received a call from a "concerned citizen" on his personal cell phone.[3] The caller informed Corporal Marino that a "black male, approximately 30 to 35 years of age . . . wearing a camouflage jacket, had a small handgun on [*sic*] his waistband"[4] in the 200 block of South Harrison Street in Wilmington.

The caller was not a stranger to Corporal Marino; in fact, Corporal Marino had known the caller for 11 years during which the caller had provided information relating to criminal activity approximately five times. Corporal Marino offered that, on at least some of those prior occasions, the caller's information was reliable and led to arrests of different individuals.

On this particular occasion, though, Corporal Marino was not on duty so he relayed the information to an on-duty officer—Patrolman Raymond Shupe—who was near the area described by the caller. Because the Wilmington Police Department does not provide its officers with cell phones, the conversation between

---

[3] App. to Opening Br. at A42.
[4] *Id*. at A45.

Corporal Marino and Patrolman Shupe was held on the officers' personal cell phones. Shupe recalled that he also received a text message from Marino that day, but Marino testified he "did not text [Shupe] with any information about the informant."[5] The State did not produce any cell phone data from which it could be determined if, when, and how Marino communicated with Shupe because Marino "clean[s] [his] phone out,"[6] that is, deletes his messages, every week.

Patrolman Shupe shared the substance of Marino's message with his partner and called other officers for back-up. Soon thereafter, Shupe observed a black male meeting the informant's description—eventually identified as Murad Diggs—wearing a camouflage jacket walking in a southerly direction on South Harrison Street. Diggs, it turns out, was then 36 years old, barely outside the age range provided by the informant. As Diggs entered a convenience store, known as the Shop Smart Market, on the corner of Elm and South Harrison Streets, Patrolman Shupe parked his marked police vehicle and, recognizing that he might be confronting an armed person, waited for his back-up to arrive. When two back-up officers arrived, the four police officers—Shupe, his partner, and the two back-up officers—approached the store. All four were in Wilmington Police Department uniforms.

---

[5] *Id.* at A52.
[6] *Id*. at A62.

As Patrolman Shupe entered the store, he immediately encountered Diggs, who was leaving, in the doorway. At that moment, according to Patrolman Shupe, he intended to engage in a "consensual encounter."[7] During his suppression hearing testimony, Patrolman Shupe described his approach to Diggs as well as Diggs's reaction:

> Q. What happened as you were attempting to enter the store and he attempting to exist the store?
>
> A. I asked if I could speak with him.
>
> Q. What, if anything, did you ask him?
>
> A. I just asked if I could speak with him.
>
> Q. Why did you ask him that?
>
> A. Because I had to get reasonable articulable suspicion that he had a firearm before I acted on it.
>
> Q. Was your intention to engage in a consensual encounter?
>
> A. That was my intention.
>
> Q. What happened when you asked Mr. Diggs can I speak with you?
>
> A. He had his cell phone in one hand and a cigar in the other hand, and he threw them on the ground immediately, got into a defensive stance and started backing away, he looked left and right like he was going to run or fight.[8]

The force with which Diggs threw his phone to the ground was "significant,"[9] leading Shupe to believe that "he was trying to break it."[10] And his training and

---

[7] *Id*. at A67.
[8] *Id.*
[9] *Id*. at A68.
[10] *Id*.

5

experience in the use of firearms suggested to Shupe that the stance assumed by Diggs was "a good place to start to draw a firearm."[11]  Based on these factors and Shupe's belief—prompted by what Corporal Marino had told him—that Diggs possessed a firearm, Shupe "took a step forward and . . . grabbed a hold of . . . Diggs'[s] arm[,]"[12] for the purpose of "check[ing] for potential weapons."[13]  But Diggs did not cooperate, and a struggle ensued.

In the struggle, Diggs "began pushing and pulling to get away from [Shupe]."[14]  Two of the other officers came to Shupe's aid, eventually taking Diggs to the floor and placing him in handcuffs.  Patrolman Shupe then conducted a pat-down search of Diggs for weapons and found a loaded handgun in Diggs's waistband.  After this encounter, Patrolman Shupe asked the person behind the store's counter for access to any video recordings that might have been captured by the store's security cameras, but that employee didn't know how to work the cameras.[15]

Patrolman Shupe placed Diggs under arrest for carrying a concealed deadly weapon ("CCDW") and resisting arrest.  Two months later, Diggs was indicted for

---

[11] *Id.*

[12] *Id*. at A71.

[13] *Id.*

[14] *Id*. at A72.

[15] Shupe testified that he returned "[d]ays later" and made a similar request but was met with the same response—the store employee that day did not know how to operate the cameras, and Shupe left empty-handed.  *Id*. at A74, A89.

6

those same charges, but also—because of a prior felony conviction—for possession of a firearm by a person prohibited ("PFBPP") and possession of ammunition by a person prohibited ("PABPP").

## B.

Diggs moved the Superior Court to suppress the evidence of the loaded firearm on the grounds that it was obtained in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution and Article I, Section 6 of the Delaware Constitution. More specifically, Diggs contended that Patrolman Shupe's investigatory stop was unlawful because the officer did not have a reasonable articulable suspicion to justify that intrusion. The State responded that the totality of the circumstances, which included "the eyewitness's information, Officer Shupe's observations of the Defendant's suspicious behavior, Officer Shupe's training and experience, and the high crime area, when viewed through the eyes of a reasonable police officer constituted reasonable articulable suspicion that the Defendant was committing a crime, specifically CCDW."[16] Likewise, the State argued that Patrolman Shupe's frisking of Diggs was justified because Shupe reasonably suspected that Diggs was armed and presently dangerous.

---

[16] *Id*. at A26–27 (footnote omitted).

C.

At the hearing on Diggs's motion to suppress, Corporal Marino and Patrolman Shupe testified for the prosecution and described, respectively, Marino's receipt and transmission of the informant's tip and Shupe's response to the tip and encounter with Diggs as outlined above. For his part, Diggs presented four witnesses, two of whom were in the store during the encounter and two—Diggs's sister and mother—who were near, but outside, the store.

On the day of Diggs's arrest, Guy Bullock was working as a cook in the store's kitchen, which is approximately 30 to 45 feet from the store's front door. At his boss's request, Bullock moved toward the front of the store. It was a particularly hectic day, and Bullock's boss was concerned with "[p]otential shoplifting[] and the store being overcrowded."[17] While in the front of the store, Bullock focused on the "kids" there, interacting with those who presented a shoplifting risk.

Around that time, Bullock saw somebody grab Diggs's arm and pull him away as he opened the door to leave the store. At first, Bullock didn't know, despite Patrolman Shupe's uniform, that the person grabbing Diggs's arm was a police officer. In fact, he "thought it was getting ready to be a fight, so [he] moved [a] kid out of the way."[18] As these events unfolded—according to Bullock, "[e]verything

---

[17] *Id*. at A109.
[18] *Id*. at A114.

8

happened quickly"[19]—Bullock was "paying attention to the kids and was looking at the door"[20] as Diggs reached for it. Before Diggs's arm was grabbed, Bullock did not hear Patrolman Shupe say anything to Diggs nor did he see Diggs throw anything.

Andrea Price, a neighborhood resident, was also in the store when Diggs encountered Patrolman Shupe and confirmed that the store was crowded that day. She was behind Diggs as he opened the door to leave the store. Price "remember[ed] an officer grabbing [Diggs's] arm . . . and pulling his arm back. . . . [A]t that point[,] [Price] turned around and tried to get out of the way."[21] Price added that, after she saw the officer grab Diggs's arm, Diggs "put his hands up" and then saw him "detained on the floor."[22] Price was unable to describe the "three or four" officers she saw at the store that day because "[e]verything . . . happened so fast."[23]

The court next heard from Na'Isha Pantoja, Diggs's sister, who was outside the store. Na'Isha confirmed that her brother's encounter with the police officers occurred as Diggs was exiting and the officers were entering the store. As she approached the store with her children, Na'Isha saw a police officer grab Diggs and

---

[19] *Id.* at A111.
[20] *Id.* at A114.
[21] *Id.* at A120.
[22] *Id.*
[23] *Id.* at A131.

9

take him to the ground. After that, according to Na'Isha, the police searched Diggs 20 to 30 times.

When asked whether she heard Diggs say anything to the officer, Na'Isha first said that she did not know but then offered that Diggs "might have said" he had "his ID or something" though she wasn't "too for sure."[24] Na'Isha did not hear the officer say anything to her brother, nor did she see her brother throw anything.

Na'Isha also noted that she saw a "little light skin boy . . . [in a] fatigue jacket"[25] similar to the jacket Diggs was wearing leaving the store. It is unclear whether she saw this individual before or after she saw her brother's encounter with Patrolman Shupe. Na'Isha estimated that this "boy" was in his mid-20's; as mentioned, Diggs was 36 years old at the time.

Finally, in what must have come as a surprise, during cross-examination, Na'Isha disclosed that she recorded the incident on her cell phone. Again, the record is unclear when Na'Isha began to record the incident, but, in any event, the defense did not play the video during the suppression hearing.

Diggs's final witness at the hearing was his mother, Julia Pantoja. Like Na'Isha, Julia observed the event from outside the store. The first thing Julia noticed

---

[24] *Id*. at A138.
[25] *Id*. at A137.

as she saw the police officers approaching the store was "a couple of guys coming out"[26] of the store, one of whom was wearing a camouflaged jacket. Julia agreed with Na'Isha's assessment that this other person was "[m]aybe about 25."[27]

According to Julia, as her son was leaving the store about the same time as the officers—she recalled that there were six or seven officers—were trying to enter, "it looked like it was a tug of war, [and] the officers grabbed [Diggs's] arm."[28] She did not hear the officer say anything before he grabbed Diggs's arm. Like Diggs's other witnesses, Julia did not see Diggs throw anything. Lastly, Julia provided a more conservative estimate of the number of searches conducted by the police during Diggs's detention; she recalled that "[t]hey searched [Diggs] about six to seven times."[29]

## D.

In the Superior Court, Diggs classified Marino's informant as an anonymous informant whose information was too vague to justify Patrolman Shupe's seizure of him—a seizure that Diggs claimed occurred immediately, "before any of [his]

---

[26] *Id*. at A154.
[27] *Id*. at A161.
[28] *Id*. at A155.
[29] *Id.* at A157.

actions after the police arrived [at] the convenience store."[30]  And, according to Diggs, because the informant did not share with Marino the basis of her knowledge that the person she was reporting was armed, the reliability of her tip was further undermined.

The State countered that the totality of the circumstances, when viewed through the eyes of a reasonable police officer, supported Patrolman Shupe's suspicion that Diggs was unlawfully carrying a concealed deadly weapon.  Those circumstances included the information provided by the informant,[31] Patrolman Shupe's training and experience, and the fact that the 200 block of South Harrison Street is a "high crime area."[32]  In responding to Diggs's attack on the reliability of the informant's tip, the State invoked the informant's status as a "concerned citizen," who, under a line of cases including *Bailey v. State*,[33] and *Hooks v. State*,[34] should be considered presumptively reliable.

---

[30] Suppression Hearing Transcript at 14–15, *State v. Diggs*, No. 1810015149A  (Del. Super. Ct. Apr. 1, 2019); *see also id.* at 21 ("[Diggs's] position is . . . that the evidence shows that the officer went to the corner store, Mr. Diggs opened the door, and the officer grabbed Mr. Diggs's arm.").
[31] The State's March 22, 2019 Response to Defendant's Motion to Dismiss describes the informant as an "eyewitness."  App. to Opening Br. at A26.  But Corporal Marino's suppression-hearing testimony indicated only that he had "received information from . . . a concerned citizen that an individual in the area of the 200 block of South Harrison was in possession of a handgun."  *Id*. at A42.  Marino offered no insight into how the informant learned these purported facts as Diggs pointed out in his argument below.
[32] *Id.* at A26.
[33] 440 A.2d 997 (Del. 1982).
[34] 416 A.2d 189 (Del. 1980).

E.

The resolution of the issues presented to Superior Court depended in large part on whether Diggs was seized for Fourth Amendment purposes before or after he threw his phone and cigar down and assumed a defensive stance. It was therefore necessary for the court to untangle the varying accounts of what happened at the store's entrance that day. The Superior Court succinctly resolved "the relevant inconsistencies":

> The Court understands from all of the testimony that the encounter between Officer Shupe and Mr. Diggs happened fast over a few seconds. In addition, given the narrow aisles at the Market, no witness at the Hearing had a clear view of the face to face interaction between Officer Shupe and Mr. Diggs other than Officer Shupe. Mr. Bullock was behind Mr. Diggs and, at the request of management, talking to some boys in the shop. Ms. Pierce was also behind Mr. Diggs. Although not dealing with customers like Mr. Bullock, Ms. Pierce is 10 inches shorter than Mr. Diggs and necessarily had her view of the face-to-face encounter between Officer Shupe and Mr. Diggs blocked by Mr. Diggs. Na'Isha and Juli[a] Pantoja were outside the Market and were restricted in their view of the encounter by Officer Shupe and the additional WPD officers at the scene. Under these circumstances, the Court would expect the testimony to differ as to what exactly happened between Officer Shupe and Mr. Diggs.
>
> Officer Shupe was in an area that had recently experienced a shooting and an incident involving Molotov cocktails. The citizen informant provided that Mr. Diggs had a concealed firearm. According to Officer Shupe, Officer Shupe tried to talk to Mr. Diggs but, after asking to speak with him, Mr. Diggs reacted in a manner that Officer Shupe had never seen before. Mr. Diggs threw down the items in his hands, got into a defensive position and took steps backwards. At this point, Officer Shupe believed that Mr. Diggs had a gun and grabbed

13

him to check for weapons. A struggle ensued, other WPD officers joined in and a loaded handgun was found in Mr. Diggs'[s] waistband.[35]

The Superior Court's legal analysis proceeded from the premise that the tip received by Corporal Marino, who passed it along to Patrolman Shupe, was provided by a "citizen informant" and therefore was presumptively reliable. Given that and Patrolman Shupe's observation of an individual matching the informant's description in the location identified by the informant, the court found that "Shupe had a particularized and objective basis to suspect that Mr. Diggs was committing a crime—possible possession of a firearm without a license or, if hidden, carrying a concealed deadly weapon."[36] This, according to the court, justified Patrolman Shupe's stop of Diggs. The court then shifted its focus to whether Patrolman Shupe could frisk Diggs. Based upon the factual findings set forth above, the court was satisfied that the frisk was justified. Therefore, the court denied Diggs's motion to suppress.

And, based on those findings, the Superior Court concluded that Patrolman Shupe had made a reasonable investigatory stop and did not overstep constitutional bounds when he conducted a limited protective search of Diggs's person for weapons. Therefore, the court denied Diggs's motion to suppress.

---

[35] *State v. Diggs*, 2019 WL 1752644, at *6–7 (Del. Super. Ct. Apr. 16, 2019).
[36] *Id.* at *6.

14

After the CCDW and resisting-arrest counts were severed, Diggs proceeded to trial on the PFBPP and PABPP counts. The jury found Diggs guilty on both counts, and the court sentenced him to 18 years at Level V incarceration suspended after 10 years for 18 months of Level III intensive supervision.[37] Diggs then appealed.

G.

Broadly speaking, Diggs raises two issues on appeal. First, he challenges the Superior Court's finding that Patrolman Shupe had a sufficiently particularized and objective basis to detain him. In particular, Diggs contests the court's invocation of the "citizen informant" doctrine in its analysis of the reasonableness of the officers' seizure of Diggs. Diggs also claims that the court's factual findings regarding his reaction to Shupe's otherwise lawful approach were based on "an erroneous review of the totality of the evidence and an unjustifiable disregard of contrary facts."[38] Second, Diggs argues—for the first time on appeal—that, when the Superior Court made its suppression-hearing factual findings, it should have drawn an inference adverse to the prosecution because it did not preserve and disclose information from

---

[37] Corrected Sentence Order, *State v. Diggs*, No. 1810015149A (Del. Super. Ct. Sept. 4, 2020) (Docket Item 50).

[38] Opening Br. at 33.

15

the officers' cell phones and video surveillance evidence that might have captured Diggs's encounter with the police.

## II.

This Court reviews a trial judge's denial of a motion to suppress for an abuse of discretion.[39] Our review of the trial court's legal conclusions, however, is *de novo*.[40] When the trial court denies the motion after an evidentiary hearing, our review of its factual findings is deferential; the inquiry is whether there was sufficient evidence to support those findings and whether they were clearly erroneous.[41]

Diggs' evidentiary argument—that the Superior Court was required to apply a "'lost and/or missing evidence' inference"[42] to its suppression-hearing factual findings—was not raised in the Superior Court. Under this Court's rules, "[o]nly questions fairly presented to the trial court may be presented for review."[43] In other words, an argument not made in the trial court is deemed to have been waived. "[We] may excuse a waiver, however, if [we] find[] that the trial court committed plain error requiring review in the interests of justice."[44] "Plain error is limited to

---

[39] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1284 (Del. 2008).
[40] *Id.* at 1285; *Stafford v. State*, 59 A.3d 1223, 1227 (Del. 2012).
[41] *Lopez-Vazquez*, 956 A.2d at 1285; *see also Downs v. State*, 570 A.2d 1142, 1144 (Del. 1990).
[42] Opening Br. at 38.
[43] Supr. Ct. R. 8.
[44] *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995).

16

material defects . . . apparent on the face of the record; . . . basic, serious and fundamental in their character, . . . [that] clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[45]

III.

The Fourth Amendment protects the citizenry from unwarranted governmental searches and seizures. Likewise, Article I, § 6 of the Delaware Constitution provides that "[t]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures."[46] Under the exclusionary rule, evidence obtained by searches and seizures that violate these guarantees is inadmissible.[47] Diggs claims that the police unjustifiably seized him during the store encounter and that, therefore, the evidence obtained as a result of the seizure, i.e., the gun and ammunition, should have been suppressed under the exclusionary rule.

Generally speaking, investigative encounters between law enforcement and citizens fall within three categories: consensual encounters or mere inquiries,

---

[45] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).
[46] Del. Const. art. I, § 6.
[47] *Mapp v. Ohio*, 367 U.S. 643, 654 (1961) ("[A]ll evidence obtained by searches and seizures in violation of the Constitution is inadmissible in a state court."); *Jones v. State*, 745 A.2d 856, 872 (Del 1999) ("The exclusionary rule acts as a remedy for a violation of a defendant's right to be free of illegal searches and seizures. It provides for the exclusion from trial of any evidence recovered or derived from an illegal search and seizure.").

investigative detentions, and formal arrests. The category into which an encounter fits depends on the nature and extent of the contact. A consensual encounter would include—as happened initially here—a police officer asking the citizen a question. Such an encounter is not a seizure under the Fourth Amendment or Article I, § 6 of the Delaware Constitution and therefore no level of suspicion is required to support it. As the United States Supreme Court put it in *Florida v. Royer*

> law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.[48]

The next level of encounters—investigative detentions—are more intrusive and are considered seizures under the Fourth Amendment and Article I, § 6.[49] Typical investigative detentions include motor-vehicle stops and stops of persons who are "abroad[] or in a public place."[50] Under Section 1902(c) of the Delaware Criminal Code, such a detention "shall not exceed 2 hours . . . [and] is not an arrest."[51] Under Delaware law, an arrest "is the taking of a person into custody in

---

[48] *Florida v. Royer*, 460 U.S. 491, 499 (1983); *see also Woody v. State*, 765 A.2d 1257, 1283 n.3 (Del. 2001).
[49] *Lopez-Vazquez*, 956 A.2d at 1288–89.
[50] 11 *Del. C.* § 1902.
[51] 11 *Del. C.* § 1902(c).

order that the person may be forthcoming to answer for the commission of a crime."[52]

In this case, Superior Court found—and the parties do not dispute—that, when Patrolman Shupe grabbed Diggs by the arm, Shupe transformed a consensual encounter into an investigative seizure. Thus, under both federal and Delaware constitutional law, it was incumbent upon Shupe "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."[53] In this Court's words, an investigative detention "must be justified at its inception by reasonable suspicion of criminal activity as defined in *Terry v. Ohio*."[54] "A determination of reasonable suspicion must be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[55]

This level of justification is often referred to as "reasonable articulable suspicion" and is "'considerably less' than proof by a preponderance of the evidence and less demanding than probable cause,"[56] which is necessary to support an arrest.

---

[52] 11 *Del. C.* § 1901.
[53] *Terry v. Ohio*, 392 U.S. 1, 21 (1968).
[54] *Caldwell v. State*, 780 A.2d 1037, 1046 (Del. 2001) (citing *Terry*, 392 U.S. at 16–19).
[55] *Jones*, 745 A.2d at 861.
[56] *Quarles v. State*, 696 A.2d 1334, 1337 (Del. 1997) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also Adams v. Williams*, 407 U.S. 143, 147 (1972) (recognizing that an

In one effort to define the contours of reasonable suspicion, the United States Supreme Court observed that "the concept . . . , like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.'"[57]

## A.

Diggs now mounts a five-fold challenge to the Superior Court's determination that Patrolman Shupe's detention of Diggs was supported by a reasonable articulable suspicion. First, Diggs claims that the court's conclusion that Marino's informant qualified as a "citizen informant" whose tip was presumptively reliable was erroneous. Second, he contends that the presumption of reliability afforded to the informant's tip is an impermissible conclusive presumption under 11 *Del. C.* § 306. Third, Diggs argues that the absence of any information about the informant's basis of knowledge—that is, how the informant came to know that the individual she described was concealing a handgun in his waistband—rendered her tip unreliable. Fourth, Diggs contends that Patrolman Shupe was not entitled to rely on the information from Corporal Marino as the "sole basis"[58] to stop Diggs. And fifth, Diggs challenges the Superior Court's finding that Diggs engaged in suspicious

---

informant's tip that is "insufficient for . . . [an] arrest or search warrant" may nonetheless carry a sufficient indicia of reliability for an investigative detention).

[57] *Sokolow*, 490 U.S. at 7 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

[58] Opening Br. at 31.

behavior when Patrolman Shupe asked him if he was willing to speak with him thereby providing the basis to conduct a limited search for weapons.

## B.

Because our analysis of Diggs's legal arguments is largely driven by the facts, we take up Diggs's challenge to the Superior Court's factual findings first. The thrust of Diggs's complaint is that the court should have credited the testimony of Bullock and Price, to the exclusion of Patrolman Shupe's testimony, on two important points. Specifically, Diggs notes that Bullock did not hear the officer say anything before grabbing Diggs's arm, and neither Bullock nor Price saw Diggs throw anything. Thus, according to Diggs, the court should have rejected Patrolman Shupe's testimony that Diggs engaged in suspicious behavior, forcefully throwing down his phone and cigar and assuming a defensive stand "like he was going to run or fight,"[59] in response to Shupe's casual question.

As mentioned before, our review of the factual findings of the Superior Court, following an evidentiary hearing on a motion to suppress is deferential.[60] Findings on credibility determinations, are subject to the "clearly erroneous" standard.[61] And

---

[59] App. to Opening Br. at A68.
[60] *See supra* note 41 and accompanying text; *see also Woody*, 765 A.2d at 1261.
[61] *Guererri v. State*, 922 A.2d 403, 406 (Del. 2007).

21

"[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[62]

Here, the record supports two permissible views of the evidence as it related to whether Shupe first asked to speak with Diggs and whether and to what extent Diggs reacted strangely to Shupe's approach, including whether Diggs threw items to the floor and assumed a position indicative of an intent to fight or flee before Shupe grabbed him by the arm. Shupe, recognizing that armed with the tip alone, he needed "to get reasonable articulable suspicion that [Diggs] had a firearm before [he] acted on it,"[63] said that he intended to engage in a consensual encounter with Diggs. But as soon as he asked Diggs if he could speak with him, Diggs responded in a way that led Shupe to believe, based on his training and experience, that Diggs not only might "run or fight" but that he might have been preparing to draw a weapon.[64]

To be sure, Diggs's witnesses perceived the event differently and in a way that could cause a fact-finder to doubt whether Patrolman Shupe said anything to Diggs before grabbing him and whether Diggs behaved precisely as Shupe described. But each of those witnesses were subject to limitations on their ability to

---

[62] *Lopez v. State*, 861 A.2d 1245, 1249 (Del. 2004) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).
[63] App. of Opening Br. at A67.
[64] *Id*. at A67–68.

see and hear what happened, and some were members of Diggs's immediate family. For instance, Bullock, who testified that he did not hear Patrolman Shupe say anything to Diggs and did not see Diggs throw anything, acknowledged that his attention was divided between the suspected shoplifters in the store and the encounter in the store's doorway. Price, who, like Bullock did not hear anyone say anything to Diggs and did not see Diggs throw anything, was behind Diggs and therefore had an obstructed view of the police officers. As Price recalled, "[e]verything . . . happened so fast, so . . . [she didn't] quite recall seeing [the officers'] faces."[65] And the testimony of Na'Isha and Julia Pantoja—Diggs's sister and mother, respectively, and thus vulnerable to a charge of bias—was hampered by the fact that neither was inside the store.

Under these circumstances, we cannot conclude that the Superior Court's adoption of Patrolman Shupe's version of the encounter was clearly erroneous. To be clear, had the court rejected Patrolman Shupe's version and credited the equally permissible view of the evidence Diggs favored, we could not conclude that such a choice was clearly erroneous. But when presented with differing accounts of historical facts, "it is the [trial court's] role to resolve the conflicts in witnesses' testimony and weigh their credibility."[66] In this case, the trial court thoughtfully

---

[65] *Id*. at A131.
[66] *Johnson v. State*, 929 A.2d 784, 2007 WL 1575229, at *1 (Del. May 31, 2007) (TABLE).

23

weighed the witnesses' competing versions and made findings that were supported by sufficient evidence. Consequently, we reject Diggs's claim that those findings were erroneous. Those findings, moreover, undercut Diggs's legal arguments which, to the extent necessary, we now take up in turn.

C.

The central thrust of the legal arguments Diggs presses on appeal—as distinguished from his criticism of the court's factual findings discussed above—is that the Superior Court misapplied the so-called "citizen informant" doctrine when it assessed the reasonableness of Patrolman Shupe's conduct. Diggs leads with the assertion that Corporal Marino's informant was not in fact a citizen informant as that term has been defined and follows with a critique of the reliability of the informant's tip and Patrolman Shupe's minimal corroboration of it.

In contrast to the showing of credibility or reliability that is required when evaluating a typical informant's tip, under the "citizen informant" doctrine, the reliability of information provided by "an average law abiding citizen performing a civic duty by reporting a crime"[67] is sometimes presumed. "The citizen-informer is a passive observer with no connection with the underworld, and no reason to fabricate what he has seen or heard, and as such is considered presumptively

---

[67] *Bailey*, 440 A.2d at 999.

reliable."[68]  The most typical application of this presumption of reliability involves a "person appearing to be an average citizen [who] takes the initiative in communicating to the police the fact that he has been a victim or a witness to a crime such as robbery or assault."[69]

In our view, Diggs rightly questions whether the suppression-hearing record supports the Superior Court's finding that Corporal Marino's informant "was not a member of the criminal community, but rather an individual who occasionally telephoned police to report incidents of which he or she had knowledge."[70]  Although Corporal Marino described the informant as a "concerned citizen,"[71] he did not confirm that the informant was not of the criminal milieu.  Additionally, it is unclear—despite the State characterization of the informant as an "eyewitness"[72]—whether the informant witnessed the described person possessing the firearm as reported.

These gaps raise legitimate questions about the applicability of the "citizen informant" doctrine here.  What is more, the informant's possession of Corporal Marino's personal cell phone number and her history of providing several tips over

---

[68] *Hooks*, 416 A.2d at 202.
[69] 2 Wayne R. LaFave, *Search and Seizure:  A Treatise on the Fourth Amendment*, § 3.4(a) at 267 (5th ed. 2012).
[70] *Diggs*, 2019 WL 1752644, at *6.
[71] App. to Opening Br. at A42.
[72] *See supra* note 31.

a period of 11 years sets this informant apart from the typical "citizen informant." Yet because, as we explain below, the legality of the seizure of Diggs's gun does not turn exclusively on the reliability of the informant's tip, we need not answer those questions. The pertinent question instead is whether the additional facts that came to light after Corporal Marino relayed the tip to Patrolman Shupe sufficiently bolstered the tip regardless of the tipster's classification. The question asked differently is: even if we were to accept Diggs's contention that Corporal Marino's tipster must be treated as an anonymous informant whose information is not presumed to be reliable, did Patrolman Shupe's later observations, coupled with the tip and the minimal corroboration of it, create a reasonable suspicion of criminal activity? Our answer is yes.

Before explaining this answer, we note that Diggs never confronts this issue on these terms. Instead, he argues that Patrolman Shupe relied on the informant's tip, as relayed to him by Corporal Marino, as the "sole basis" for stopping Diggs.[73] Diggs doubled down on this assertion at oral argument, claiming that "[t]his was all driven by the tip and [that] this case is really about the tip and whether it provided reasonable suspicion."[74] Alternatively, Diggs depicts his reaction to Patrolman

---

[73] Opening Br. at 31.

[74] See Oral Argument Video at 18:50, https://livestream.com/accounts/5969852/events/9642389/videos/221607748.

Shupe as merely "act[ing] in a way to avoid speaking to the police."[75]  But we have already rejected Diggs's invitation to reduce the totality of the circumstances upon which Patrolman Shupe based his decision to detain Diggs to the informant's tip. And Diggs's watered down description of his reaction to Shupe's approach cannot be squared with Shupe's description of the encounter—a description the trial court credited and upon which we base our ensuing analysis.

D.

That the police seized Diggs, within the meaning of the Fourth Amendment and Article I, § 6, in the entrance way of the store is not disputed.  The parties' positions are less clear, however, as to when the seizure took place.  The Superior Court found—and the State seems to concede—that Patrolman Shupe seized Diggs when, after Diggs threw down his phone and cigar and assumed a defensive stance, Shupe grabbed Diggs by the arm.  For his part, in his briefs, Diggs assiduously avoids identifying the point at which the encounter turned into a seizure.  Yet Diggs conceded at oral argument that Patrolman Shupe's initial approach and inquiry of Diggs did not constitute a seizure,[76] and nowhere does he contest the trial court's

---

[75] Opening Br. at 36.
[76] Oral Argument Transcript, May 26, 2021.

27

determination that the seizure occurred when Shupe grabbed Diggs's arm. Consequently, our analysis focuses on the quantum of information Shupe possessed at that time in determining whether Diggs's detention was warranted.

The evidentiary record supports the conclusion that the following specific and articulable facts were known to Patrolman Shupe before he detained Diggs. Corporal Marino had informed Shupe that a reliable witness had told him that a Black male, approximately 30 to 35 years of age and wearing a camouflage jacket, was on the 200 block of South Harrison Street, which Shupe described as "a high crime area."[77] According to the tip as relayed by Marino, the described individual was "armed with a handgun, and it was in his waistband."[78]

Shupe responded to the area "very quickly"[79] and observed an individual—Diggs—walking in a southerly direction on Harrison Street. Shupe watched as Diggs entered the Shop Smart convenience store and eventually followed him there, encountering Diggs in the doorway. There were several people, including children, in the front of the store near the doorway.

---

Justice Traynor:  Would you agree that neither the Fourth Amendment or Article I, Section 6 of the Delaware Constitution prohibited Officer Shupe from approaching Mr. Diggs and asking to speak with him?

Counsel for Diggs:  I agree.

[77] App. to Opening Br. at A62.
[78] *Id.* at A61.
[79] *Id.* at A63.

When Shupe asked Diggs if he could speak with him, Diggs forcefully threw down his cell phone and also discarded a cigar. Then Diggs assumed an odd stance, which Shupe described alternatively as "defensive"[80] and "athletic."[81] Based on his training and experience, Shupe inferred that Diggs "was going into flight or fight mode"[82] and had placed his hands in "a good place to start to draw a firearm."[83] At that point, Shupe's belief that Diggs possessed a firearm solidified, and he "grabbed a hold of Mr. Diggs'[s] arm . . . to detain him . . . [for] further . . . investigation."[84]

That these facts, viewed in their totality, justified Patrolman Shupe's investigative detention of Diggs seems evident to us. One simple way to reach that conclusion is to ask what Shupe was to do at each step along the way. Was it improper for the officer to follow up on the tip by responding to the designated area to determine whether an individual meeting the tipster's description would be found there? Of course not. Upon seeing such an individual there, was it unlawful for Shupe to approach him and ask if the two might talk? Diggs himself answers this question in the negative. So we are left with assessing the reasonableness of detaining an individual who reportedly possesses a weapon in a crowded convenience store and who reacts to a lawful inquiry by a uniformed police officer

---

[80] *Id*. at A67.
[81] *Id*. at A95.
[82] *Id*. at A97.
[83] *Id*. at A68.
[84] *Id.* at A71.

29

not by declining, politely or otherwise, to speak with the officer but by acting in a way that could be interpreted as aggressive, if not dangerous. Under these circumstances, it was reasonable, in our view, for Shupe to suspect that the informant's tip was credible and that Diggs was armed or otherwise engaged in criminal activity.[85] Hence, the detention was reasonable and did not constitute a violation of Diggs's constitutional rights.

It follows from this conclusion that Patrolman Shupe's protective search of Diggs's person for weapons was lawful.[86] Diggs does not argue otherwise.[87]

E.

Our determination that the Superior Court's factual findings were supported by sufficient evidence and not clearly erroneous and our conclusion that, even in the absence of the presumption of reliability assigned to the purported "citizen

---

[85] To be clear, we do not hold today that the informant's tip, standing alone, justified the detention of Diggs, only that the tip, coming as it did from an informant with whom Corporal Marino was familiar and who had previously supplied reliable information, was not entirely devoid of value and was worthy of consideration under the "totality of the circumstances" test.

[86] 11 *Del. C.* § 1903 ("A peace officer may search for a dangerous weapon any person whom the officer has stopped or detained to question as provided in § 1902 of this title, whenever the officer has reasonable ground to believe that the officer is in danger if the person possesses a dangerous weapon."); *see also State v. Rollins*, 922 A.2d 379, 386 (Del. 2007) ("During a *Terry* stop, an officer may conduct a limited protective search for concealed weapons. So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.") (quotation marks and footnotes omitted).

[87] Diggs contends that the search of his person was unlawful but only because his detention was unlawful. As we understand his argument, he does not contend that, even if his detention were lawful, the ensuing pat-down search for weapons was nevertheless unlawful.

informant," Diggs's detention and search were lawful, renders our consideration of Diggs's Section 306 argument unnecessary. Likewise, because our analysis of the reasonableness of Patrolman Shupe's suspicion is limited to his presumptively reliable personal observations and the facts that Corporal Marino communicated to him, we need not consider Diggs's claim that the Superior Court violated the "collective knowledge" doctrine as explained in *State v. Cooley*.[88]

## IV.

Diggs next argues that, because the investigating officers failed to collect and preserve certain evidence—data from Marino's and Shupe's cell phone and the store's surveillance video—the Superior Court was required to draw a "lost/missing evidence inference" when it determined the facts relevant to Diggs's motion. Despite his not having requested the court to adopt such an inference, Diggs contends that the court's failure to do so "resulted in the deprivation of [his] due process right to a fair suppression hearing."[89] Diggs concedes that this claim is subject to plain-error review as we have described it earlier.

.

---

[88] 457 A.2d 352 (Del. 1983).
[89] Opening Br. at 47.

31

Diggs's argument raises interesting questions regarding how a trial court, sitting as the fact-finder in a pretrial evidentiary hearing that is not concerned with the defendant's guilt or innocence, should handle a claim that the State has failed to collect and preserve arguably relevant evidence.[90] But our standard of review—plain error—obviates the need to take up those questions.

First of all, the relevance of the text messages and call logs on the officers' personal cell phones is marginal at best—unless, of course, Diggs claims that the officers' testimony that they communicated by cell phone shortly before apprehending Diggs was made up out of whole cloth. But that is not what Diggs contends. Instead, he vaguely alleges that "[t]his evidence was relevant to the suppression issues as it related to the circumstances of the tip, and the substance of the information exchanged."[91] And what is more, Diggs does not identify a single factual finding by the Superior Court that could have been undermined by the cell phone records. Thus, we conclude that, even if the State had an obligation to preserve and produce the officers' cell phone data, Diggs has not shown that its failure to produce them violated Diggs's due process rights as Diggs alleges.

---

[90] We are mindful of this Court's determination that the prosecution's obligation to disclose exculpatory information can extend to pretrial proceedings and information not directly relevant to guilt or innocence when the withholding of that information "deprives the defendant of an opportunity to vindicate a possible deprivation of his constitutional rights." *O'Neil v. State*, 691 A.2d 50, 54 (Del. 1997); *see also Pierson v. State*, 351 A.2d 860 (Del. 1976).

[91] Opening Br. at 39.

The same is true for Diggs's claim that the failure of the police to collect and preserve the store surveillance video resulted in a deprivation of Diggs's due process right to a fair suppression hearing. Diggs claims that the video was subject to disclosure under Superior Court Criminal Rule 16 because he requested it, and because it was potentially exculpatory and relevant to suppression issues. But Diggs does not show how the video was in "the possession, custody, or control of the state,"[92] the *sine qua non* of the State's discovery obligation.

On this last point, Diggs's argument runs head-on into the Superior Court's factual findings.

> After the arrest, Officer Shupe asked a person for the footage from a camera located in the Market. Officer Shupe was told by a person working at the Market that he did not know how to retrieve the footage. At a later date, Officer Shupe went back and tried again to retrieve the footage but, once again, was told that no one could retrieve the footage and give it to him.[93]

Nevertheless, Diggs contends that "[t]he police had sufficient authority and opportunity to secure the surveillance video, either through a search warrant or subpoena."[94] Diggs cites no authority for this proposition, which, in fact, runs contrary to our precedent.[95] In short, Diggs demonstrated neither that the failure of

---

[92] Super. Ct. Crim. R. 16.
[93] *Diggs*, 2019 WL 1752644, at *3.
[94] Opening Br. at 44.
[95] *See Schaffer v. State*, 184 A.3d 841, 2018 WL 1747793, at *4–5 (Del. Apr. 10, 2018) (TABLE) (addressing the limits of investigators' duty to gather evidence under *Brady* and Rule 16) *Williams*

the police to secure the surveillance video resulted in a violation of his due process rights nor that the surveillance video amounted to "lost or missing evidence" such that the court was required to draw an inference adverse to the prosecution.

V.

The judgment of the Superior Court is AFFIRMED.

---

*v. State*, 100 A.3d 1022, 2014 WL 4179121, at *3 (Del. Aug. 21, 2014) (TABLE) (rejecting contention that the prosecutor engaged in misconduct by failing to collect exculpatory evidence, including surveillance videos from a mall and gas station).